IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA MENICHINO, et al., individually )
and on behalf of all others similarly )
situated, )
                                     )
             Plaintiffs, )      Civil Action No. 12-0058
                                     )
          v. )
                                     )
CITIBANK, N.A., et al., )
                                     )
             Defendants. )

## OPINION

**Mark R. Hornak, United States District Judge**

This is a putative class action for mortgage services fraud pursuant to the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.. Plaintiff Linda Menichino, on behalf of herself and others similarly situated, alleges that Defendants Citibank, N.A., CitiMortgage, Inc., ABN AMRO Mortgage Group (the mortgagees), Citibank Mortgage RE, AAMBG RE (the captive reinsurers), and Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, and Mortgage Guaranty Insurance Corporation (the primary mortgage insurers, or PMIs) engaged in an unlawful fee-splitting and kickback arrangement in connection with the Plaintiffs' residential mortgages. The Plaintiffs also bring a state-law unjust enrichment claim pursuant to 28 U.S.C. § 1367. They request treble damages, attorneys' fees, and costs. The Defendants have filed Motions to Dismiss in accordance with Federal Rule of Civil Procedure

12(b)(6),[1] arguing that the Plaintiffs' claims are untimely because they were brought outside of RESPA's one-year statute of limitations. See 12 U.S.C. § 2614.

Because the Plaintiffs' claims are facially untimely and they have not pled nearly enough to save their claims via any recognized tolling doctrine, the Defendants' Motions to Dismiss (ECF Nos. 92, 96) will be granted, without prejudice.

## I. BACKGROUND

The facts set forth below are derived entirely from the Plaintiffs' First Amended Complaint ("FAC" or "Complaint," ECF No. 64). The Plaintiffs allege that the Defendants engaged in a reinsurance scheme where no real risk was transferred between the PMIs and the mortgagees' reinsurance subsidiaries in violation of RESPA's prohibition on kickbacks and unearned fees. (Id. at ¶¶ 11, 64-98; see also 12 U.S.C. § 2607(a)-(b).) Although the Plaintiffs concede that their claims fall outside of RESPA's one-year statute of limitations, they contend that they were prevented from learning about their claims' existence because the Defendants fraudulently concealed the true purpose of the arrangement. The Plaintiffs argue that: (1) RESPA's one-year statute of limitations may be equitably tolled, and (2) they have pled sufficient facts to toll the statute here. The Defendants contend that the claims are unsalvageable.

### A. The Alleged Kickback Scheme

The thirteen (13) named Plaintiffs in this lawsuit obtained residential mortgages from one of the two mortgagee defendants between 2005 and 2008. (FAC at ¶¶ 12-21.) They reside in six

---

[1] The First Amended Complaint originally named as defendants two PMIs which were not alleged to have sold primary mortgage insurance to any of the named Plaintiffs. Accordingly, those defendants moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) on jurisdictional grounds. The Plaintiffs voluntarily terminated those defendants from the case (ECF Nos. 109, 110), thus rendering moot those portions of the motions to dismiss.

states: Pennsylvania, North Carolina, Georgia, Maryland, New York, and Illinois. (Id.) Because the Plaintiffs made down payments of less than 20 percent of the price of their homes, the mortgagee Defendants required them to purchase mortgage insurance from the various PMI defendants. (Id. at ¶¶ 2, 12-21.) Primary mortgage insurance protects the mortgagee in the event that the borrower defaults on the loan. (Id. at ¶ 2.) In a typical primary mortgage insurance arrangement, the PMI will indemnify the mortgagee only up to the first 20-30 percent of the potential claim for coverage. (Id. at ¶ 51.) The insurance premiums are paid by the borrower to the mortgagee either directly through additional monthly premium or indirectly through a higher interest rate; the mortgagee then remits the premium to the PMI. (Id. at ¶¶ 50-52.) The terms of the policy, including the selection of the PMI, are arranged entirely by the mortgagee without the borrower's involvement. (Id. at ¶ 53.) The mortgagee is the policy's sole beneficiary. (Id.)

Once the PMI has contracted with the mortgagee to provide insurance coverage, the PMI will in turn hedge its position by purchasing its own insurance, or "reinsurance," on a portion of the risk that it has assumed under the insurance contract. (Id. at ¶ 54.) Reinsurance in the mortgage industry is sold in one of two forms: as a "quota share," where the reinsurer agrees to assume a fixed percentage of the PMI's total loss under the insurance contract with the mortgagee, or as an "excess-of-loss," where the reinsurer is liable to the PMI only for a specified dollar "band" of loss, such that dollar losses below the band and dollar losses above the band are borne entirely by the PMI. (Id. at ¶¶ 55-57.)

As the Plaintiffs explain in their voluminous Complaint, "[i]n the early years of the mortgage industry, there were no financial ties between lenders and the private mortgage insurers. In the mid-1990s, however, mortgage [lenders] began looking for ways to capitalize on the booming private mortgage insurance market." (Id. at ¶ 58.) To increase their presence in this

3

market space, many mortgage lending companies created reinsurance subsidies "to enter into contracts with private mortgage insurance providers, whereby the reinsurer typically agreed to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans." (Id.) Essentially, in exchange for the mortgagee's steady stream of business, PMIs agree to reinsure their interests with that mortgagee *exclusively* through the mortgagee's reinsurance subsidiary. This arrangement is known as "captive" reinsurance because the PMI is not free to contract with other reinsurers with respect to the loans it insures for the particular mortgagee. Captive reinsurance was and still is widespread within the mortgage services industry, and is lawful as long as there is "a real transfer of risk" between the PMI and the captive reinsurer. (Id. at ¶¶ 58-59, 61.)

RESPA prohibits the delivery or acceptance of any referral fee, kickback, or fee-split in connection with the provision of real estate settlement services. 12 U.S.C. § 2607(a)-(b). Fees for "services actually performed" do not fall within this prohibition. Id. The statute's purpose is to provide home buyers with accurate information on the nature and costs of the real estate settlement process and to protect them from unnecessarily high settlement charges and other abusive practices designed to increase fees. § 2601.

Not surprisingly, captive reinsurance arrangements are vulnerable to scrutiny under RESPA because the mortgage lender's parent company is also the parent of the reinsurer. By 1997, the U.S. Department of Housing and Urban Development began advising mortgagees that captive reinsurance arrangements where "there is no reasonable expectation that the reinsurer will ever have to pay claims" to the PMI would warrant scrutiny because such transactions contain no "real transfer of risk" between the parties. (FAC at ¶ 61; see also ECF No. 64, Ex. 22.) The Financial Accounting Standards Board has decreed that to meet the risk transfer

4

requirement, it must be reasonably likely that the reinsurer could sustain a significant loss from the transaction. (FAC at ¶¶ 68-75.)

## B. **The Plaintiffs' Mortgages**

The named plaintiffs in this lawsuit closed on their residential mortgages between 2005 and 2008. (Id. at ¶¶ 12-21.) Each purchased their mortgage from either Citibank or ABN AMRO and their primary mortgage insurance from either Genworth, Radian, or Mortgage Guaranty, each of whom in turn was reinsured through either Citibank RE or AAMBG RE, their mortgagee's respective reinsurance subsidiary.

The mortgage documents that the Plaintiffs signed at closing contained disclosures regarding their mortgagee's captive reinsurance arrangement. For instance, ABM AMRO's disclosure states that it "may have entered into or may in the future enter into a reinsurance treaty with AAMBG Reinsurance," a subsidiary with whom ABN maintained "a business relationship."[2] (Id. at ¶ 121.) Similarly, CitiMortgage's disclosure states that its captive reinsurer "Citibank Mortgage Reinsurance, Inc. will assume a portion of the risk associated with the Mortgage Insurance on your loan."[3] (Id. at ¶ 122.) Both disclosures state that the PMI would

---

[2] ABN AMRO's disclosure more fully states: "As disclosed on the Good Faith Estimate of Settlement Services, mortgage insurance is required for your loan. Mortgage insurance companies sometimes enter into contracts called reinsurance treaties with other insurance companies. Under this type of arrangement, the second insurance company, or the reinsurer, receives a portion of the premium paid for mortgage insurance in return for assuming a portion of the risk covered by the mortgage insurance. The mortgage insurance company your loan is assigned to may have entered into or may in the future enter into a reinsurance treaty with AAMBG Reinsurance, a Vermont Corporation. This is to give you notice that ABN AMRO Mortgage Group, Inc. has a business relationship with AAMBG Reinsurance. The nature of the relationship is that AAMBG Reinsurance is a wholly owned subsidiary of an affiliate of ABN AMRO Mortgage Group, Inc. Because of this relationship, your obtaining mortgage insurance through this mortgage insurer may provide ABN AMRO Mortgage Group, Inc. a financial or other benefit....Whether you choose to subject your mortgage insurance to a reinsurance treaty is voluntary." (ECF No. 64, Ex. 44)

[3] Citibank's disclosure more fully states: "Your mortgage loan requires Primary Mortgage Guaranty Insurance ("Mortgage Insurance"), issued by a Mortgage Insurance Company ("Mortgage Insurer"). Mortgage

buy reinsurance only through the mortgagee's reinsurance subsidiary and would do so with a portion of the Plaintiffs' remitted mortgage payment.

Between September 2011 and August 2012, the Plaintiffs, after "obtain[ing] the assistance of counsel," began contacting their mortgagees and PMIs "in an effort to obtain further information about the reinsurance of the private mortgage insurance on [their] current mortgage[s]." (Id. at ¶¶ 126-40.) Each Plaintiff alleges that he or she spoke with a handful of customer service representatives who either could not provide any specific information about the loan's PMI or reinsurer, or claimed that they did not know the meaning of "captive reinsurance," or could not confirm who the particular Plaintiff's PMI was or if the mortgage was reinsured, or just provided flatly wrong information. Only named Plaintiff Rosemary Jackson alleges that she spoke with someone above the level of a customer service representative, namely a customer service supervisor who was still unable to answer her questions. (Id. at ¶ 134.)

The Plaintiffs contend that it was only after these inquiries that they were "put on notice of the possibility" of their claims, because the mortgage agreements that they signed at closing were "incomplete, inaccurate and/or misleading" "form documents" that were designed to fool

---

Insurance is typically required on non-government loans when the loan amount is 80% or more of the secured property's value...If you fail to make your mortgage loan payments or comply with the terms of your loan documents, the Mortgage Insurance reimburses the lender or subsequent owner of your loan [] for a portion of the financial losses they may incur....The Mortgage Insurer which is providing Mortgage Insurance on your loan has a reinsurance relationship with a Reinsurance Company known as "Citibank Mortgage Reinsurance, Inc." Under this reinsurance relationship, Citibank Mortgage Reinsurance, Inc. will assume a portion of the risk associated with the Mortgage Insurance on your loan and will receive a portion of the Mortgage Insurance premiums you pay. The purpose of this Disclosure is to notify you that the Lender identified above, CitiMortgage, Inc., and Citibank Mortgage Reinsurance, Inc. are affiliated companies within Citigroup, a diversified financial services company. Under the Reinsurance relationship described above, Citibank Mortgage Reinsurance, Inc. receives a portion of the Mortgage Insurance Premiums you pay, and the Lender identified above or CitiMortgage, Inc., as affiliates of Citibank Mortgage Reinsurance, Inc., may receive a financial benefit...If you do not want the Mortgage Insurance on your loan to be reinsured by Citibank Mortgage Reinsurance, Inc., please mail or fax a letter to that effect to CitiMortgage, Inc." (ECF No. 64, Ex. 48)

them into believing that real and significant risk was being transferred between the PMI and captive reinsurer. (Id.; see also ¶¶ 118-19.) Despite this allegation, however, the Plaintiffs also acknowledge (as they must) that the documents affirmatively indicated that the mortgages were almost certain to be reinsured by the mortgagees' respective reinsurance subsidiary because they made down payments of less than 20 percent. (Id. at ¶¶ 121-23.)

## C. **The Plaintiffs File Suit**

This action was originally filed on January 13, 2012. The Plaintiffs filed their FAC on December 4, 2012, and the Defendants filed separate Motions to Dismiss on February 4, 2013. In the FAC, the Plaintiffs allege that the PMIs' and captive reinsurers' public filings with the National Association of Insurance Commissioners reveal that no real risk was transferred between the PMIs and captive reinsurers. (Id. at ¶¶ 9, 11.) This lawsuit is one of many that the Plaintiffs' counsel is pursuing against other mortgagees, PMIs, and captive reinsurers in other federal district courts.[4]

## II. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) empowers a district court to dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp.

---

[4] See, e.g., Ba v. HSBC USA, No. 13-cv-0072 (E.D.Pa. filed Jan. 4, 2013); Barlee v. First Horizon Nat. Corp., No. 12-cv-3045 (E.D.Pa. filed May 31, 2012); Hill v. Flagstar Bank, No. 12-2770 (E.D.Pa. filed May 18, 2012); Manners v. Fifth Third Bank, No. 12-cv-0442 (W.D.Pa. filed Apr. 5, 2012); Riddle v. Bank of America Corp., No. 12-cv-1750 (E.D.Pa. filed April 5, 2012); White v. PNC Fin. Svcs. Group, No. 11-cv-7928 (E.D.Pa. filed Dec. 31, 2011)(Motion to Dismiss granted without prejudice June 20, 2013, ECF No. 146); see also Orange v. Wachovia Bank, N.A., No. 12-cv-1683 (C.D.Cal. closed June 19, 2013); Samp v. JP Morgan Chase Bank, N.A., No. 11-cv-1950 (C.D.Cal. closed May 7, 2013); McCarn v. HSBC USA, No. 12-cv-0375 (E.D.Cal. closed Dec. 4, 2012).

v. Twombly, 550 U.S. 544, 570 (2007)).  A complaint is facially plausible if it alleges sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and that "discovery will reveal evidence of the necessary element[s]" of the claim.  Id.; W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010).  Legal conclusions couched as factual allegations, conclusory factual allegations, and threadbare recitations of a cause of action are insufficient to state a facially plausible claim. Iqbal, 556 U.S. at 678-79.

In addition to pleading adequate factual content, the complaint also must be legally sufficient.  Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555.  To determine the complaint's legal sufficiency, the court must accept as true all of the facts, but not the legal conclusions, alleged, draw all reasonable inferences in the plaintiff's favor, and confirm that the accepted-as-true facts actually give rise to a claim that would entitle the plaintiff to relief.  Id.  Moreover, a complaint fails to state a claim upon which relief can be granted if it seeks to bring an action beyond the applicable statute of limitations period and the plaintiff cannot demonstrate that the limitations period should otherwise be tolled.  Yang v. Odom, 392 F.3d 97, 101 (3d Cir. 2004); Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002).

### III. DISCUSSION

The Plaintiffs readily acknowledge that their cause of action falls outside of RESPA's one-year statute of limitations, but they assert and argue that the statute should be tolled because the Defendants engaged in a self-concealing fraud that prevented the Plaintiffs from discovering the existence of their claims until long after the limitations period expired.  (FAC at ¶¶ 143-49) Because the Plaintiffs have failed to plead sufficient facts to support the applicably of any

8

recognized tolling doctrine, their RESPA and unjust enrichment claims must be dismissed. Consistent with Third Circuit amendment doctrine, however, the Plaintiffs will be given one (1) more opportunity to plead enough plausible and specific facts to show why their untimely claims would be entitled to tolling.

## A. **RESPA Claim**

RESPA prohibits kickbacks and unearned fees in connection with the provision of real estate settlement services. Payments from a PMI to a captive reinsurer on a reinsurance policy where no real risk is transferred potentially run afoul of this prohibition and, if proven, would likely subject all parties involved to liability. The statute of limitations for bringing a claim under RESPA is one year from the date of the real estate closing. Snow v. First American Title Ins. Co., 332 F.3d 356, 358-60 (5th Cir. 2003); Morilus v. Countrywide Home Loans, Inc., 651 F.Supp.2d 292, 307 (E.D.Pa. 2008); see also Sarsfield v. Citimortgage, Inc., 707 F.Supp.2d 546, 560 (M.D.Pa. 2010)(the one-year statute limitations period in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., the sister statute to RESPA, accrues on the date of the real estate closing).

The statute of limitations on a cause of action begins to run when the plaintiff first discovers or should have discovered that he or she has been injured. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir. 1994). This is the accrual date. Id. at 1386. Once the cause of action accrues, the plaintiff is afforded the full limitations period, starting from the accrual date, to file suit. Id. Tolling doctrines, on the other hand, stop the statute of limitations from running where the claim's accrual date has passed. Id. at 1387. In this sense, they function as a corollary to statutes of limitations: while statutes of limitations protect defendants by ensuring that actions against them are brought within a reasonable amount of time,

tolling doctrines serve the opposite purpose of foiling defendants from profiting from their own wrongdoing where they have prevented a plaintiff from asserting a timely cause of action. See id. at 1388; Zeleznik v. United States, 770 F.2d 20, 22 (3d Cir. 1985). Nevertheless, the tolling of statutory periods on equitable grounds is "very much restricted" given "the important social interests in certainty, accuracy, and repose" that such statutes serve. Geromette v. Gen. Motors Corp., 609 F.2d 1200, 1203 (6th Cir. 1979); Cada v. Baxter Healthcare Corp, 920 F.2d 446, 453 (7th Cir. 1990). Because limitations periods "must be strictly construed" to serve these important interests, "tolling is an extraordinary remedy which should be extended only sparingly." Hedges v. United States, 404 F.3d 744, 751 (3d Cir. 2005); Seitzinger v. Reading Hosp. and Med. Ctr., 165 F.3d 236, 240 (3d Cir. 1999)(noting that equitable tolling claims must be approached "warily, so as to guard against possible misuse").

1. **Threshold Issues**

a. **RESPA's Statute of Limitations**

The limitations periods contained in federal statutes are customarily subject to tolling unless doing so would be inconsistent with the statute's text. Young v. United States, 535 U.S. 43, 49-50 (2002). Courts presume that Congress drafts statutes of limitations in light of this long-established principle.    Id.; Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946). Accordingly, the majority of federal courts that have considered the issue have held that RESPA's one-year statute of limitations period may be tolled. Egerer v. Woodland Realty, Inc. 556 F.3d 415, 421 (6th Cir. 2009)(citing Young); Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1166 (7th Cir. 1997); Carr v. Home Tech Co., Inc., 476 F.Supp.2d 859, 869 (W.D.Tenn. 2007); Mullinax v. Radian Guar. Inc., 199 F.Supp.2d 311, 328 (M.D.N.C. 2002); Pedraza v. United Guar. Corp., 114 F.Supp.2d 1347, 1353 (S.D.Ga. 2000); Kerby v.

Mortg. Funding Corp., 992 F.Supp. 787, 793-96 (D.Md. 1998); Moll v. United States Title Ins. Co., 700 F.Supp. 1284, 1286-89 (S.D.N.Y. 1988).

Although our Court of Appeals has not squarely addressed this issue, all available indicators suggest that if directly presented with the question, it would side with the weight of authority holding that RESPA's limitations period may be tolled. The matter is of some significance here, because when the Court of Appeals most recently considered the scope of RESPA's statute of limitations, albeit in *dicta*, it did not take a position and referred to Hardin v. City Title & Escrow Co., 797 F.2d 1037 (D.C. Cir. 1986), the lone case holding that RESPA's limitations period is jurisdictional and not subject to tolling, as potentially viable authority. In re Comm. Bank of N. Va., 622 F.3d 275, 307 (3d Cir. 2010)("Comm. Bank II").[5] Hardin was based on a narrow reading of section 2614's language as well the observation that TILA's limitations period had (up until that time) also been held to be jurisdictional. Id. (citing Rust v. Quality Car Corral, Inc., 614 F.2d 1118, 1119 (6th Cir. 1980), holding on the issue abrogated by Bartlik v. U.S. Dept. of Labor, 62 F.3d 163, 167 n.1 (6th Cir. 1995)).

Federal courts have since generally abandoned this line of reasoning. In a TILA case decided a decade after Hardin, the Third Circuit held that whether a limitations period is jurisdictional depends upon "whether congressional purpose is effectuated by tolling the statute

---

[5] This case, which has a long and tortured history in the Third Circuit that continues into the present, involves untimely claims of mortgage services fraud under RESPA (as well as TILA and the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639) that the plaintiffs there argue are entitled to equitable tolling. At various junctures in the life of the case, two panels of the Court of Appeals for the Third Circuit as well as two courts in this judicial district have offered incremental guidance on how equitable tolling claims should be evaluated on Rule 12(b)(6) review. See In re Comm. Bank of N. Va., 418 F.3d 277 (3d Cir. 2005)(reversed and remanded order approving class action settlement); In re Comm. Bank of N. Va., 467 F.Supp.2d 466 (W.D.Pa. 2006), vacated and remanded, 622 F.3d 275 (3d Cir. 2010); In re Comm. Bank of N. Va. Mortg. Practices Litig., 2013 WL 3279551 (W.D.Pa. June 27, 2013). Only the Court of Appeals' 2010 decision and the District Court's 2013 memorandum are relevant here. They are referred to as "Comm. Bank II" and "Comm. Bank N. Va," respectively.

of limitations in given circumstances." Ramadan v. Chase Manhattan Corp. 156 F.3d 499, 502

(3d Cir. 1998). Noting that TILA is a remedial statute designed "to guard against the danger of

unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing

practices," the Court held that a jurisdictional interpretation of TILA's one-year limitations

period would frustrate Congress's intent that these consumer protection laws are to be "construed

liberally in favor of the consumer." Id. at 502; see also Comm. Bank II, 622 F.3d at 306 & n.24.

The Ramadan Court also approvingly cited cases permitting equitable tolling in RESPA actions,

and did so in the same breath that it refused to extend Hardin's jurisdictional construction of

RESPA's limitations period to TILA. Ramadan, 156 F.3d at 503. As previously discussed,

RESPA and TILA have essentially the same purpose: to protect consumers against fraud in real

estate transactions. These factors lead this Court to conclude that Hardin is not the applicable

rule in this Circuit, and that our Court of Appeals would permit RESPA's limitations period to be

equitably tolled.

### b. **Tolling at the Rule 12(b)(6) Stage**

At the outset, the parties disagree on whether the tolling of RESPA's statute of

limitations may be decided on the basis of the Complaint alone. The Plaintiffs submit that the

applicability of any particular tolling doctrine is a fact-driven inquiry that must be developed in

discovery and decided only at the summary judgment stage of the litigation. The Court rejects

this argument as made because it contravenes long-established Third Circuit law that, in light of

the interests in finality and integrity of the truth-seeking process, a district court may dismiss an

untimely cause of action if it is plain on the face of the complaint that the limitations period

cannot be tolled. See Hedges, 404 F.3d at 751; Lake v. Arnold, 232 F.3d 360, 365 (3d Cir.

2000)(plenary review is extended "to the District Court's choice and interpretation of applicable

tolling principles and its conclusion that the facts prevented a tolling of the statute of limitations" at the Rule 12(b)(6) stage); Yang, 392 F.3d at 101; Robinson, 313 F.3d at 135 (referring to this principle as the "Third Circuit Rule"). Essentially, it is what the Plaintiffs knew or should have known, and what they did or reasonably should have done in response, that lies at the core of the various flavors of equitable tolling. The Plaintiffs do not need to take discovery from *themselves* to flesh out these facts in the Complaint. It is not asking too much to require the Plaintiffs to play *their* factual cards face-up, now, in seeking to invoke the extraordinary safety valve of tolling to rescue claims that even they concede are otherwise untimely.

That said, the Court of Appeals has cautioned that "because the question whether a particular party is eligible for equitable tolling *generally* requires consideration of evidence beyond the pleadings, such tolling is *generally* not amenable to resolution on a Rule 12(b)(6) motion." Comm. Bank II, 622 F.3d at 301-02 (emphasis added). This Court takes these words for what they are: a wise admonition that where the plaintiff's invocation of equitable tolling involves facts that can be developed *only through discovery*, the district court should refrain from deciding the matter until it has the benefit of a fully developed record. At the motion to dismiss stage, where the facts alleged in the complaint are accepted as true and all doubts are resolved in the plaintiff's favor, often the deciding court will find itself compelled to postpone this analysis until later in the litigation. However, this is not an absolute rule, nor a *de facto* free pass for a plaintiff, because the complaint must still withstand the strictures of Rule 12(b)(6) review. To the extent that the Plaintiffs here assert that this language from Comm. Bank II is an unyielding prohibition on a district court's obligation to evaluate the applicability of a particular tolling doctrine at the Rule 12(b)(6) stage, or as an indication that our Court of Appeals has abrogated the so-called "Third Circuit Rule," they miss the mark.

13

The Plaintiffs of course bear the burden of showing that their untimely claims may be entitled to equitable tolling. Oshiver, 38 F.3d at 1391-92. To meet this burden, the Plaintiffs must "plead the applicability of the doctrine." Comm. Bank II, 622 F.3d at 301 (citing Oshiver, 38 F.3d at 1391-92). The use of the word *plead* in this regard is crucial, because it establishes that a plaintiff must do more than just invoke the doctrine with conclusory allegations. By reiterating this rule in Comm. Bank II, which was decided after the Supreme Court delineated the facial plausibility pleading standard in Twombly and Iqbal, our Court of Appeals signified that a plaintiff's tolling claim is subject to the Twombly/Iqbal standard of review. See id. Thus, to "plead the applicability" of a tolling doctrine, the face of the complaint must set forth "sufficient factual matter" to allow the court "to draw the reasonable inference" that discovery will show that the plaintiff's untimely claim is entitled to tolling. Id.; Iqbal, 556 U.S. at 678.

## 2. **Equitable Tolling**

### a. **General Principles**

To establish an entitlement to equitable tolling, the plaintiff must show that (1) the defendant engaged in fraudulent concealment by actively misleading the plaintiff, (2) which prevented the plaintiff from recognizing the validity of his or her claim within the limitations period, and (3) that the plaintiff's ignorance is not attributable to his or her lack of reasonable due diligence in attempting to uncover the relevant facts. Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494, 510 (3d Cir. 2006); Forbes v. Eagleson, 228 F.3d 471, 486-87 (3d Cir. 2000).[6]

---

[6] There is considerable overlap between equitable tolling and two other related tolling doctrines, fraudulent concealment and equitable estoppel, which has led to conflicting formulations of the doctrines among the Courts of Appeals. For example, according to the Seventh Circuit, equitable tolling applies only where the plaintiff cannot obtain vital information bearing on the claim despite all due diligence and regardless of any actions of the defendant, whereas fraudulent concealment and equitable estoppel involve, respectively, affirmative efforts by the defendant "to conceal the fraud" or "promis[es] not to plead the statute of limitations," both of which have the effect of "prevent[ing] the plaintiff from suing on time." Cada, 920 F.2d at 450-51. The Third Circuit, on the other hand, has

Regardless of the defendant's actions, equitable tolling will be inapplicable if the plaintiff was on inquiry notice of the possible existence of the claim during the limitations period yet failed to investigate the possible existence of the claim. Cetel, 460 F.3d at 507. A plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable person, through the exercise of due diligence, to discover his or her injury. Id.; Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 n.3 (7th Cir. 1995); Au Rustproofing Ctr., Inc. v. Gulf Oil Corp., 755 F.2d 1231, 1237 (6th Cir. 1985)("[i]nformation sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence").

Thus, unlike equitable estoppel (a related tolling doctrine that applies only when the defendant attempts to prevent the plaintiff from initiating a timely lawsuit), equitable tolling requires a showing of *both* the defendant's attempts to conceal its actions as well as reasonable diligence on the part of the plaintiff in guarding his or her rights. Oshiver, 38 F.3d at 1389 (discussing Cada, 920 F.2d at 452-53). Read as a whole, this authority demonstrates that it is reasonable to require the Plaintiffs to plead with specificity what they knew, when and how they knew it, and what they did about it, especially since they were in possession of these facts when they filed their Complaint.

Further, to demonstrate fraudulent concealment, the plaintiff must show actively misleading conduct by the defendant that goes *"above and beyond"* the wrongdoing that underlies the substantive cause of action. Lukovsky v. City and Cnty. of San Francisco, 533 F.3d 1044, 1052 (9th Cir. 2008)(emphasis in original); Leckey v. Stefano, 501 F.3d 212, 228 (3d

---

incorporated fraudulent concealment into equitable tolling. Forbes, 228 F.3d at 486-87; compare also Lukovsky v. City and Cnty. of San Francisco, 533 F.3d 1044, 1051 (9th Cir. 2008)(fraudulent concealment is part of equitable estoppel; equitable tolling focuses exclusively on whether there was excusable delay by the plaintiff). However, regardless of precise formulation, each doctrine serves the same basic purpose: to permit the plaintiff's pursuit of an otherwise ultimately cause of action in order to prevent a manifest injustice.

Cir. 2007); Cada, 920 F.2d at 451. Such conduct typically involves the defendant making patently false representations to the plaintiff after it has committed the underlying substantive wrong. See Oshiver, 38 F.3d at 1389. Where the underlying claim *itself* involves fraudulent conduct, there is an inevitable tendency to "merge the substantive wrong with the tolling doctrine." See Cada, 920 F.2d at 451. This cannot be permitted, because it would double-count the substantive wrong with the fraudulent concealment and inexorably lead to the tolling of the statute of limitations simply by virtue of being pled, thereby violating the express will of Congress in enacting a limitations period in the first place.

Our sister court's recent decision in In re Comm. Bank of N. Va. Mort. Lending Practices Litig. ("Comm. Bank N. Va.") demonstrates how these principles may be applied in a Rule 12(b)(6) context. 2013 WL 3279551 (W.D.Pa. June 27, 2013). There, the plaintiffs alleged with precision and specificity that their mortgagees concealed an elaborate kickback scheme by fraudulently misrepresenting key information in their TILA disclosures and Home Ownerships Equity Protection Act ("HOEPA," 15 U.S.C. § 1639) notices. They set forth the details of the alleged scheme. Joint Amended Consolidated Class Action Complaint at ¶ 408, ECF No. 507, Comm. Bank N. Va., MDL No. 1674, Civ. Action Nos. 02-1201, 03-425, 05-688, 05-1386 (W.D.Pa.). The plaintiffs also alleged that the HUD-1 statements they received further concealed the scheme by reciting fraudulent settlement charges, which had the effect of validating the false representations in the TILA and HOEPA forms. Id. at ¶¶ 408(f), 408(g), and 409; see also Comm. Bank II, 622 F.3d at 306. In that case, the multitude of specific details was sufficient to plead both that the defendants' documents were actively misleading and that the plaintiffs could not have learned of their claims during the limitations period, because the alleged fabrications in the HUD-1 statements made it impossible to detect the fraud and also rendered

futile any due diligence they may have attempted.  See 2013 WL 3279551, at *19; Comm. Bank II, 622 F.3d at 306 (facts alleged in the first class action complaint were "suggestive of [the] fraudulent concealment" required to invoke equitable tolling); see also Meyer v. Riegel Prods. Corp., 720 F.3d 303, 308 (3d Cir. 1983)(defendant-employer telling plaintiff-employee that he was terminated due to a "reorganization," which was untrue, was sufficient to demonstrate that plaintiff-employee was prevented from timely discovering the existence of his age discrimination claim, because there was no other reasonable means for him to learn why he was terminated).

Where, as here, the factual predicate for pleading equitable tolling resides entirely with the Plaintiffs, they are obligated to set forth a plausible factual basis for its invocation.  Comm. Bank N. Va., cited by them, completed that task in its own context.  The Plaintiffs here are likewise required to fulfill that obligation in the context of their case.

### b.  The Plaintiffs' Equitable Tolling Claim

The Plaintiffs predicate their entitlement to equitable tolling on two grounds: (1) the Defendants' form mortgage documents and disclosures, which they allege actively misled them by creating the artifice of a seemingly legitimate business arrangement and made it impossible for them to uncover the fraud, despite their full and diligent participation in the loan process, and (2) the Defendants' customer service representatives' stonewalling them when they attempted to learn more about their mortgages.

### i.  Active Misleading

First, the Plaintiffs have adequately pled that the Defendants' form documents and disclosures could be found to be actively misleading and thus that the Defendants attempted to fraudulently conceal a kickback arrangement.  To be actively misleading in this factual context, the representations in the disclosures must have contained outright affirmative falsehoods,

17

independent of the remittance of kickbacks, whose purpose was to conceal the scheme and lead astray a reasonably prudent person who is actively engaged in guarding his or her rights. See Oshiver, 38 F.3d at 1389. Even though the forms at issue here disclosed the possible trilateral relationship between the mortgagee, eventual PMI, and the mortgagee's captive reinsurer, both also affirmatively stated that the reinsurer would "assume a portion of the risk" in exchange for a portion of the premium paid by the borrower to the PMI. Accepting as true the voluminous details of the alleged trilateral "pay-to-play" scheme, this would be affirmatively deceptive and is sufficient to plead active misleading and fraudulent concealment.

## ii. **Inquiry Notice**

Nevertheless, despite any active misleading and fraudulent concealment regarding the transfer of actual risk, the Complaint fails to plead the circumstances under which, when, and how the Plaintiffs became aware of the possible existence of their cause of action and why that could not have been accomplished within the limitations period. This deficiency is fatal to their claimed entitlement to equitable tolling. To be sure, Citi and ABN's disclosures state that the PMI was almost certain to reinsure a portion of the mortgage and would do so only through the mortgagee's captive reinsurer, and that the parties would exchange funds in doing so, albeit as premium for actual risk. It would be unjust to conclusively determine at the pleading stage that this language alone should have placed the Plaintiffs on inquiry notice at closing that something was awry. Comm. Bank II, 622 F.3d at 301-02.

However, merely showing that the disclosures were misleading does not get the Plaintiffs past the post. They still bear the burden of plausible pleading, which in light of the allegations made in the Complaint requires them to set forth the circumstances that led them to discover the possible existence of their claims. This is the only way the Court can determine whether fact

discovery will show that they were not on inquiry notice during the limitations period. This was not necessary in <u>Comm. Bank N. Va.</u>, because the plaintiffs there made a facial showing that the fraudulent charges on the HUD-1 statements made it impossible for them to find anything during the limitations period that would have alerted them to the possibility that something was amiss.

Here, on the other hand, the Plaintiffs allege in only generalized and conclusory terms that they could not have discovered the possible existence of their claims during the limitations period. Yet in the next breath, they acknowledge that somewhere along the line they became suspicious of the reinsurance arrangement that they read about years before in their closing papers, and thus decided to seek legal advice. The Complaint says nothing about what prompted the Plaintiffs' suspicions or when, nor does it aver why this was possible only after the limitations period expired, other than to say that it was all impossible without counsel.

While such facts were not central in <u>Comm. Bank N. Va.</u>, the Plaintiffs have made it an issue here with their allegations. At the Rule 12(b)(6) stage, the Plaintiff's claimed entitlement to equitable tolling must be plausible on its face. Without sufficient facts to determine what led the Plaintiffs to discover their claims and when, this threshold burden has not been met. Given the engagement of the Plaintiffs' counsel in the many other RESPA actions in which this issue is on the table, and in light of the heft of the substantive allegations made in the Complaint, requiring the Plaintiffs to plead the facts that could actually allow the Court to proceed to the merits of the case is hardly a burden of Olympian dimensions.

### iii.  <u>Due Diligence</u>

The pleading deficiency with respect to the previous element cascades into the next one. Without knowing the factual circumstances that ultimately gave rise to the Plaintiffs' discovery of their injuries, the Court is similarly unable to determine whether they have pled that the due

diligence they say they exercised was reasonable under the circumstances. What the Court can glean from the Complaint is that the Plaintiffs "fully and diligently participated in the loan process and reviewed the documents presented to them" (FAC at ¶ 149), yet sometime later, they hired counsel and "in an effort to obtain further information" about their mortgages (FAC at ¶ 126), they made one phone call to their mortgagee and one phone call to their PMI, wrote down the names of the customer service representatives they spoke with, and then stopped investigating. Plaintiff Linda Menichino made the most number of phone calls, a total of four between November 2011 and January 2012, and only Plaintiff Rosemary Jackson spoke to someone above the level of a customer service representative. (FAC at ¶¶ 126-140.)

The Plaintiffs' *own allegations*, accepted-as-true, give rise to doubts rather than confidence that discovery will show that equitable tolling should apply: for example, if the Plaintiffs read all of their documents at closing and participated fully in the process as they say they did (FAC at ¶ 149), why did they wait so long to find out who their PMI was or if their loan was reinsured, given that the disclosures stated that the PMI had not yet been selected at the time the loans closed? Why did they make so few calls and speak only with customer service representatives? As pled, this quantum of diligence appears to be just perfunctory "box checking," which is insufficient to invoke equitable tolling, rather than the careful research of one who is actively engaged in guarding his or rights. See Cetel, 460 F.3d 508 ("plaintiffs who undertake no diligence beyond superficial inquiry…cannot obtain the benefit that a finding of reasonable diligence will confer"); Oshiver, 38 F.3d at 1389. However, depending on what happened between closing and the Plaintiffs' discovering their injuries, the Plaintiffs' diligence may have been reasonable. The Court is simply unable to make this conclusion without the

requisite facts being pled, all of which were *exclusively in the Plaintiffs' control* when they filed the Complaint.[7]

Taking their allegations as a whole, the Plaintiffs appear to be saying that "given the misleading text of the disclosure and the way I was treated by the Defendants' customer service representatives when I tried to learn more, it does not matter that I investigated my potential claim several years after the limitations period expired, because I would have been stonewalled then exactly as I was now." There is no way to determine whether fact discovery might prove this without knowing more about when and how the Plaintiffs became aware of their claims. What the Plaintiffs here need, and what the plaintiffs in Comm. Bank N. Va. had, is a fact-based showing that they could not have learned about the possibility of their claims during the limitations period. Without this, the Plaintiffs have not pled an entitlement to equitable tolling that is plausible on its face.[8]

---

[7] The district courts that have recently considered this same motion have reached varying results. See n.4, supra. In holding that the Plaintiffs have failed to meet their pleading burden, this Court does not, as did the district courts in McCarn, 2012 WL 5499433, at *6-7 (E.D.Cal. Dec. 4, 2012), Samp, 2013 WL 1912869, at *7 (C.D.Cal. May 7, 2013), and Orange, No. 12-1683, ECF No. 72 (May 6, 2013)(minute order granting dismissal), offer any view as to whether the Plaintiffs were on inquiry notice or failed to exercise the requisite due diligence. However, the Court notes its disagreement with Barlee, 2013 WL 706091, at *5 (E.D.Pa. Feb. 27, 2013), Riddle, 2013 WL 1482668, at *9 (E.D.Pa. April 11, 2013), Ba, 2013 WL 3238066, at *1 (E.D.Pa. June 27, 2013), and Hill, No. 12-cv-2770 ECF No. 71 (June 27, 2013) that the Plaintiffs' merely declaring that they could not have learned about the possible existence of their claims is enough to plead an entitlement to equitable tolling in light of controlling Third Circuit law. See Comm. Bank II, 622 F.3d at 301; Hedges, 404 F.3d at 751; Yang, 392 F.3d at 101.

[8] In support of their argument that their equitable tolling claim is plausible as pled, the Plaintiffs refer to Lutz v. Chesapeake Appalachia, L.L.C., 2013 WL 2321338, --- F.3d ---- (6th Cir. May 29, 2013). There, the Court reversed the dismissal of the complaint based on untimeliness, holding that "[w]here there is "some question as to the depth and scope of [the plaintiffs'] investigation, [the plaintiffs] should be allowed to proceed forward."" Id. at *13. The Plaintiffs thus submit that any doubts about their being on inquiry notice or the adequacy of their investigation must be resolved in their favor. In light of applicable Third Circuit law that a plaintiff's tolling claim must be plausible on its face to survive Rule 12(b)(6) review, this Court does not believe that it can evaluate the Complaint in such a fashion. See Yang, 392 F.3d at 101; Comm. Bank II, 622 F.3d at 301.

### 3. **Continuing Violations**

The Plaintiffs also advance a continuing violations theory in an effort to preserve their untimely RESPA claims. Specifically, they submit that each remittance of a monthly mortgage payment constituted a continuing violation of federal law that re-set the accrual date for the cause of action. This argument is inconsistent with applicable Circuit law and must be rejected.

To avail itself of the continuing violations theory, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful [] practice and that at least one act falls within the applicable limitations period." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165-66 (3d Cir. 2013). The theory applies only to continual unlawful acts that are part of a persistent and ongoing pattern, not continuing consequences of an original violation. Ocean Acres Ltd. P'ship v. Dare Cnty. Bd. of Health, 707 F.2d 103, 106 (4th Cir. 1983); see also Cowell v. Palmer Twp., 263 F.3d 286, 292-93 (3d Cir. 2001)(in a section 1983 lawsuit, a township's conduct in issuing liens and later refusing to remove them constituted a single act rather than a continuing course of conduct);[9] Huckabay v. Moore, 142 F.2d 233, 238 (5th Cir. 1998)(in a Title VII case, "the mere perpetuation of the effects of time-barred discrimination does not constitute a violation...in the absence of independent actionable conduct occurring within the statutory period."). The theory is most frequently applied in civil rights cases and employment suits involving allegations of discrimination and hostile work environment where repetition and continuity of conduct are part and parcel of the claim itself. Courts generally have been hesitant to expand it to other claims.

---

[9] This Court recently noted that the Third Circuit's opinion in Mandel abrogated the three-factor test for continuing violations set forth in Cowell. See Rankin v. Smithburger, 2013 WL 3550894, at *4-5 (W.D.Pa. July 11, 2013). However, the remainder of Cowell, including its discussion of the principles underlying the continuing violations doctrine, remains good law.

RESPA's statute of limitations speaks only of "a single triggering violation, not multiple violations." Snow, 332 F.3d at 359 (citing section 2614). Similarly, in "creating the private right of action for kickbacks and fee-splitting" in section 2607, "Congress also spoke of a single 'violation,'" thus implying that the statutory regime envisions a kickback scheme with ongoing payments as comprising a "single integrated transaction." Id. In this sense, the closing of the mortgage and continuous premium payments are more properly conceived of as "a single violation followed by continuing consequences," where the closing of the mortgage is the single actionable violation and the recurring payments towards the mortgage balance are the continuing ill effects. Id. (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)); see also In re Smith, 737 F.2d 1549, 1552 (11th Cir. 1984)(in action involving TILA's one-year statute of limitations, "[n]ondisclosure is not a continuing violation for purposes of the statute of limitations.").

In these circumstances, tolling the statute of limitations through the application of a continuing violations theory would extend "indefinitely the limitations period for private plaintiffs suing under § 2607" and "create a limitations period that is longer than Congress could have contemplated." Snow, 332 F.3d at 359. Courts have been willing to apply the continuing violations theory to time-limited claims like hostile work environment because, to make out a cause of action, the plaintiff must show a series of discrete events over time whose "cumulative effect" comprises a "discriminatory practice." Huckabay, 142 F.3d at 239. The plain language of RESPA does not envision such a cumulated series of events as giving rise to a cause of action. Therefore, it would be inappropriate as a matter of law to apply the continuing violations theory to RESPA's statute of limitations in light of these considerations.

## B. Unjust Enrichment Claim

The Plaintiffs' supplemental unjust enrichment claim must also be dismissed. A district court may decline to exercise jurisdiction over a supplemental state law claim if it has dismissed the federal claim or claims upon which the lawsuit was based. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009). The court's decision must reflect considerations of judicial economy, convenience, and fairness to the litigants. Id. As a general rule, once the underlying federal claim has been dismissed, the court should not proceed with a lawsuit comprised entirely of supplemental state law claims unless extraordinary circumstances exist. See Englert v. City of McKeesport, 872 F.2d 1144, 1152-53 (3d Cir. 1989); see also In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 16 (1st Cir. 2008) and Paulsen v. Local No. 856 of Intern. Broth. of Teamsters, 377 Fed.Appx. 706, 708 (9th Cir. 2010)(both applying this rule to putative class actions where the federal claim was dismissed and only supplemental claims remained). If the court declines jurisdiction over the supplemental state law claim, it must dismiss that claim without prejudice. Kach, 589 F.3d at 650.

Of the thirteen (13) named plaintiffs in this lawsuit, only the unjust enrichment claims of two are potentially timely, and there is no indication that extraordinary circumstances exist that would otherwise warrant the Court's retaining jurisdiction over them. The Court will therefore dismiss the Plaintiffs' unjust enrichment claim without prejudice.

## IV. CONCLUSION

To be absolutely clear, this Court expresses no view on the underlying merits of the Plaintiffs' RESPA and unjust enrichment claims. Rather, the Court finds that the accepted-as-true facts presented in the Complaint do not show, and in fact raise doubts about, whether

discovery might produce evidence that the Plaintiffs' untimely claims should be equitably tolled. This factual deficiency, especially when viewed in light of the long-established principle that courts should be wary of invoking equitable tolling at all, see Seitzinger, 165 F.3d at 240, necessitates the conclusion that the Complaint in its current form must be dismissed.

For the reasons set forth above, the Defendants' Motions to Dismiss (ECF Nos. 92, 96) will be granted. Because the Plaintiffs' First Amended Complaint is factually deficient rather than legally deficient, the Court will grant leave to file one (1) curative amendment. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434-35 (3d Cir. 1997). Therefore, Court will dismiss the First Amended Complaint without prejudice. An appropriate order follows.

Mark R. Hornak
United States District Judge

Dated: July 19, 2013