UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA MENICHINO, VINCENT MENICHINO, NATISHA B. SLOLEY, MICHAEL HAMILTON, JEREL T. SIMONDS, JEFFREY PROFFITT, ROSEMARY JACKSON, TRACI LOMBRE, KEVIN M. MULLIN, KAREN RULISON, JOSEPH RULISON and CONSTANTIN CRANGANU, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | Civil Action No.: 2:12-CV-00058-GLL |
| | ) | |
| Plaintiffs, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) ) | |
| | ) | |
| CITIBANK, N.A., CITIMORTGAGE, INC. (individually and as successor-by-merger to ABN AMRO Mortgage Group, Inc.), CITIBANK MORTGAGE REINSURANCE, INC., ABN AMRO MORTGAGE GROUP, INC., AAMBG REINSURANCE, GENWORTH MORTGAGE INSURANCE CORP., RADIAN GUARANTY, INC., MORTGAGE GUARANTY INSURANCE CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) ) ) ) ) | |
| | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

INTRODUCTION

1.      This is a proposed nationwide action brought by Plaintiffs Linda Menichino, Vincent Menichino, Natisha B. Slolely, Michael Hamilton, Jerel T. Simonds, Jeffrey Proffitt, Rosemary Jackson, Traci Lombre, Kevin M. Mullin, Karen Rulison, Joseph  Rulison and Constantin Cranganu (collectively, "Plaintiffs") on behalf of themselves and (1) a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Defendant Citibank, N.A. ("Citibank") and/or Defendant CitiMortgage, Inc. ("CitiMortgage") (collectively, "Citi"), or any of their subsidiaries and/or affiliates between January 1, 2004 and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance that was reinsured with CitiMortgage's captive reinsurance affiliate, Defendant Citibank Mortgage Reinsurance, Inc. ("Citibank Mortgage RE") (collectively with Citibank and CitiMortgage, the "Citi Defendants") (hereinafter, the "Citi Class"); and (2) a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Defendant ABN AMRO Mortgage Group, Inc. ("ABN"), or any of its subsidiaries and/or affiliates during the Class Period and, in connection therewith, purchased private mortgage insurance that was reinsured with ABN's captive reinsurance affiliate, Defendant AAMBG Reinsurance, Inc. ("AAMBG RE") (collectively with ABN, the "ABN Defendants") (hereinafter, the "ABN Class").[1]

2.      In this action, Plaintiffs challenge the Defendants' violations of the strict prohibition against kickbacks, referral payments and unearned fee splits codified in the Real Estate Settlement Procedures Act of 1974 ("RESPA").  In particular, the Citi Defendants and the

_____

[1]      The Citi Class and the ABN Class are collectively referred to as the "Classes."

ABN Defendants, under an agreement or understanding with non-Defendant private mortgage insurance providers PMI Mortgage Insurance Company ("PMI"), United Guaranty Residential Insurance Co. ("UGI"), Republic Mortgage Insurance Co. ("Republic"), and Triad Guaranty Insurance Corp. ("Triad"), and Defendants Radian Guaranty, Inc. ("Radian"), Genworth Mortgage Insurance Company ("Genworth"), and Mortgage Guaranty Insurance Corp. ("MGIC") (collectively, the "Private Mortgage Insurers") (together with the Citi Defendants and the ABN Defendants, and excluding non-defendants PMI, UGI and Republic, "Defendants") have violated RESPA in two ways: (a) in exchange for Citi's and ABN's referral of their mortgage borrowers' business, the Private Mortgage Insurers made illegal referral payments in the form of purported reinsurance premiums to Citibank Mortgage RE and AAMBG RE; and (b) Defendants received an unlawful split of private mortgage insurance premiums paid by the borrowers that Citi and ABN referred to the Private Mortgage Insurers.  Plaintiffs seek statutory damages and/or restitution for Defendants' unjust enrichment.

3.    Private mortgage insurance is a form of insurance that a home purchaser providing a down payment of less than 20% of the purchase price of the purchaser's home is typically required to purchase at closing.  Although the premium is paid by the borrower, private mortgage insurance protects the lender in the event of a default by the borrower, and the borrower typically has no involvement in the selection of the borrower's private mortgage insurance provider.

4.    RESPA is the primary federal law regulating residential mortgage settlement services.  RESPA, and regulations promulgated thereunder, cover both (i) the "provision of services involving mortgage insurance" and (ii) the referral by lenders of insurance business to private mortgage insurance providers.  *See* 12 U.S.C. § 2607(a); 24 C.F.R. § 3500.2(b).

5.     In particular, Section 2607(a) of RESPA prohibits any person from providing or accepting kickbacks or referral fees from any person providing a real estate settlement service, including private mortgage insurers.  Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(a) prohibits private mortgage insurers from providing kickbacks or referral fees to providers of real estate settlement services, including lenders and their affiliates.  Accordingly, it is unlawful for private mortgage insurers to pay referral fees to lenders or their affiliates.

6.     Separately, Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—from any person providing a real estate settlement service, including private mortgage insurers, other than for services actually performed.  Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(b) prohibits private mortgage insurers from providing any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders or their affiliates, other than for services actually performed.  Accordingly, it is unlawful for private mortgage insurers to pay unearned fee splits to lenders or their affiliates.

7.     As alleged herein, in an effort to exploit the booming private mortgage insurance market for easy profits, Defendants violated RESPA's kickback and referral fee prohibitions through a scheme to provide sham reinsurance on private mortgage insurance policies.

8.     Specifically, upon information and belief, Defendants entered into an "agreement or understanding, oral or otherwise" pursuant to which the Private Mortgage Insurers paid (or "ceded") to Citibank Mortgage RE and AAMBG RE a significant portion of the mortgage

3

insurance premiums they received from Citi's and ABN's borrowers in return for Citi's and ABN's referral of private mortgage insurance business.  12 U.S.C. § 2607(a).  In this regard, Citi and ABN allocated their mortgage insurance business on a systematic, rotating basis to the Private Mortgage Insurers and, in return, each of the Private Mortgage Insurers agreed to cede a portion of the mortgage insurance premiums they received from Citi's and ABN's borrowers to Citibank Mortgage RE and AAMBG RE in the form of purported "reinsurance" premiums.  Such payments, which Citibank Mortgage RE and AAMBG RE pass through to their respective parents in the form of lucrative dividends and other payments, continue to date.

9.      While the Private Mortgage Insurers' payments to Citibank Mortgage RE and AAMBG RE are purportedly for "reinsurance" services, Citibank Mortgage RE and AAMBG RE have received them while assuming very little or no actual "risk" on the underlying reinsurance contracts, in light of applicable rules, regulations and standards.  These contracts, which were not furnished to Plaintiffs or the Classes and were not publicly available, provide the Private Mortgage Insurers with no recourse if Citibank Mortgage RE and AAMBG RE abandon their purported reinsurance obligations at any time, or if Citibank Mortgage RE and AAMBG RE provide only nominal capital to the dedicated trusts that purportedly exist to fund private mortgage reinsurance claims (as discussed in detail below at ¶¶ 84-87, 110-111).  As a result: (i) the purported reinsurance provided by Citibank Mortgage RE and AAMBG RE is illusory; (ii) the purported reinsurance contracts between Citibank Mortgage RE and AAMBG RE and the Private Mortgage Insurers are shams; and (iii) the payments or premiums ceded to Citibank Mortgage RE and AAMBG RE thereunder constitute improper referral fees or kickbacks to Citi, ABN, Citibank Mortgage RE and AAMBG RE in violation of RESPA.

10.     Illustrating the scale and brazenness of Defendants' violations from the beginning

of 2004 through the end of 2011, Citibank Mortgage RE collected from the Private Mortgage Insurers at least **$150.6 million** as its "share" of borrower's private mortgage insurance premiums.  By contrast, Citibank Mortgage RE's "share" of paid claims during this time period was $36.8 million.  *See* Schedule F – Part 3 from the 2004-20011 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by Citibank Mortgage RE).   Similarly, from the beginning of 2004 through the end of 2011, AAMBG RE collected from the Private Mortgage Insurers at least **$210.3 million** as its "share" of borrower's private mortgage insurance premiums.  By contrast, AAMBG RE's "share" of paid claims during this time period was $11.2 million.  *See* Schedule F – Part 3 from the 2004-2011 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by AAMBG RE).   Significantly, because the Private Mortgage Insurers with whom Citi and ABN did business were part of the captive reinsurance scheme among the Defendants, Plaintiffs and the Classes could not have obtained a settlement service that was free from the taint of the RESPA violations alleged herein.   As a result of Defendants' conduct, Plaintiffs and the Classes were subjected to settlement services which included improper fees and kickbacks in violation of RESPA.

11.     The captive reinsurance scheme perpetuated by Defendants has been mirrored in the lending industry for years in similar arrangements involving other mortgage lenders and insurers in the lucrative private mortgage insurance sphere.  As *American Banker* magazine recently reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks

began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk."[2] Lenders like Citi and ABN created captive reinsurers to capitalize on the profits generated by the private mortgage insurers (including the Defendant Private Mortgage Insurers), then utilizing carefully crafted reinsurance contracts to all but eliminate the lender's actual reinsurance risk exposure and allow lenders to "skim" the profits generated from such arrangements.  Lenders such as Citi and ABN further insulated themselves from providing any real reinsurance by: (i) making the relevant reinsurance arrangements "self-capitalizing," meaning that the reinsurer was only required to put "nominal initial capital" into the trusts supporting the reinsurance contracts; and (ii) providing no recourse for the reinsurer's failure to adequately fund the trusts.[3]  As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs.

*See* Exhibit 2 ("Mortgage Kickback Scheme").

12.     Under applicable accounting, actuarial and regulatory standards, such arrangements, where no real risk is transferred, do not qualify as reinsurance.  In other words, Citi, ABN, Citibank Mortgage RE and AAMBG RE were "playing with the house's money" with no real or commensurate transfer of risk.  As such, they were not providing actual

---

[2]     Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say*, American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/.../176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit 1 hereto ("Reinsurance Kickbacks").

[3]     Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction*, American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/mortgages-reinsurance-deals-kickbacks-HUB-1042277-1.html, attached as Exhibit 2 hereto ("Mortgage Kickback Scheme").

reinsurance, but were, rather, receiving improper fee payments and kickbacks from the Private Mortgage Insurers in clear violation of RESPA.

<div align="center">

**PARTIES**

</div>

### Plaintiffs

13.     Plaintiffs Linda Menichino and Vincent Menichino, husband and wife, obtained a mortgage loan from CitiMortgage, Inc. on or about September 6, 2007 for the purchase of their home located in New Castle, Pennsylvania.  *See* Exhibit 3 (the "Menichino Mortgage").   In connection with their loan, the Menichinos were required to pay for private mortgage insurance in the amount of $491.40 per month.  Their Private Mortgage Insurer, Genworth, was selected by their lender and was a provider with whom CitiMortgage has a captive reinsurance arrangement. Upon information and belief, their loan was included in the CitiMortgage captive reinsurance arrangement with Citibank Mortgage RE based on the date of origination and the type of loan.

14.     Plaintiffs Natisha B. Sloley and Michael Hamilton, husband and wife, obtained a mortgage loan from ABN AMRO Mortgage Group, Inc. on or about March 24, 2005 for the purchase of their home in Wake Forest, North Carolina.  *See* Exhibit 4 (the "Sloley/Hamilton Mortgage").  In connection with their loan, Plaintiffs Sloley and Hamilton were required to pay for private mortgage insurance in the amount of $150.37 per month.  Their Private Mortgage Insurer, PMI, was selected by ABN and was a provider with whom ABN had a captive reinsurance arrangement.  Their loan was reinsured by AAMBG RE.

15.     Plaintiff Jerel T. Simonds obtained a mortgage loan from ABN AMRO Mortgage Group, Inc. on or about September 19, 2007 for the purchase of his home located in Roswell, Georgia.  *See* Exhibit 5 (the "Simonds Mortgage").  In connection with his loan, Plaintiff Jerel T. Simonds was required to pay for private mortgage insurance in the amount of $82.29 per month.

<div align="center">7</div>

His Private Mortgage Insurer, MGIC, was selected by ABN and was a provider with whom ABN had a captive reinsurance arrangement. Upon information and belief, his loan was included in the ABN captive reinsurance arrangement with AAMBG RE based on the date of origination and the type of loan.

16.     Plaintiff Jeffrey Proffitt obtained a mortgage loan from ABN AMRO Mortgage Group, Inc. on or about October 24, 2005 for the purchase of his home located in Middle River, Maryland. *See* Exhibit 6 (the "Proffitt Mortgage"). In connection with his loan, Plaintiff Proffitt was required to pay for private mortgage insurance each month. His Private Mortgage Insurer, Radian, was selected by his lender and was a provider with whom ABN had a captive reinsurance arrangement. Upon information and belief, his loan was included in the ABN captive reinsurance arrangement with AAMBG RE based on the date of origination and the type of loan.

17.     Plaintiffs Karen Rulison and Joseph Rulison, husband and wife, obtained a mortgage loan from ABN AMRO Mortgage Group, Inc. on or about February 20, 2007 for the purchase of their home located in South Bristol, New York. *See* Exhibit 7 (the "Rulison Mortgage"). In connection with their loan, the Rulisons were required to pay for private mortgage insurance in the amount of $139.81 per month. Their Private Mortgage Insurer, MGIC, was selected by their lender and was a provider with whom ABN had a captive reinsurance arrangement. Upon information and belief, their loan was included in the ABN captive reinsurance arrangement with AAMBG RE based on the date of origination and the type of loan.

18.     Plaintiff Rosemary Jackson obtained a mortgage loan from Defendant CitiMortgage, Inc. on or about June 6, 2006 for the purchase of her home located in Kunkletown,

Pennsylvania.  *See* Exhibit 9 (the "Jackson Mortgage").  In connection with her loan, Plaintiff Jackson was required to pay for private mortgage insurance in the amount of $522.50 per month.  Her Private Mortgage Insurer, PMI, was selected by CitiMortgage and was a provider with whom CitiMortgage had a captive reinsurance arrangement.  Her loan was reinsured by Citibank Mortgage RE.

19.     Plaintiff Traci Lombre obtained a mortgage loan from Defendant CitiMortgage, Inc. on or about June 6, 2006 for the purchase of her home in Chicago, Illinois.  *See* Exhibit 10 (the "Lombre Mortgage").  In connection with her loan, Plaintiff Lombre was required to pay for private mortgage insurance in the amount of $109.13 per month.  Her Private Mortgage Insurer, Genworth, was selected by CitiMortgage and was a provider with whom CitiMortgage had a captive reinsurance arrangement.  Her loan was reinsured by Citibank Mortgage RE.

20.     Plaintiff Kevin M. Mullin obtained a mortgage loan from Defendant CitiMortgage, Inc. on or about May 26, 2005 for the purchase of his home located in Duluth, Georgia.  *See* Exhibit 11 (the "Mullin Mortgage").  In connection with his loan, Plaintiff Mullin was required to pay for private mortgage insurance in the amount of $107.09 per month.  His Private Mortgage Insurer, PMI, was selected by CitiMortgage and was a provider with whom CitiMortgage had a captive reinsurance arrangement.   His loan was reinsured by Citibank Mortgage RE.

21.     Plaintiff Constantin Cranganu obtained a mortgage loan from CitiMortgage, Inc. on or about July 24, 2008 for the purchase of his home in East Stroudsburg, Pennsylvania.  *See* Exhibit 12 (the "Cranganu Mortgage").  In connection with his loan, Plaintiff Cranganu was required to pay for private mortgage insurance in the amount of $122.85 per month.  His Private Mortgage Insurer, PMI, was selected by CitiMortgage and was a provider with whom

CitiMortgage had a captive reinsurance arrangement.  Upon information and belief, his loan was included in the CitiMortgage captive reinsurance arrangement with Citibank Mortgage RE based on the date of origination and the type of loan.

**Defendants**

**Citi Defendants**

22.     Defendant Citibank, N.A. is a national banking association which conducts business in Pennsylvania and throughout the United States.  Citibank, N.A. is a wholly owned subsidiary of Citicorp which is a wholly owned subsidiary of Citigroup Inc.  *See* Exhibit 13 hereto (excerpts from Citigroup Inc.'s  2004 Form 10-K, Ex. 21.01; 2005 Form 10-K, Ex. 20.01; 2006 Form 10-K, Ex. 21.01; 2007 Form 10-K, Ex. 21.01; 2008 Form10-K, Ex. 21.01; 2009 Form 10-K, Ex. 21.01; 2010 Form 10-K, Ex. 21.01; 2011 Form 10-K, Ex. 20.01).

23.     Defendant CitiMortgage, Inc., a wholly owned subsidiary of Citibank N.A., conducts business in Pennsylvania and throughout the United States.  *See* Exhibit 13. CitiMortgage, Inc. is incorporated in the state of New York and is headquartered in O'Fallon, Missouri.  *See* Exhibit 14 hereto (CitiMortgage, Inc. incorporation papers from the State of New York).  Effective September 1, 2007, CitiMortgage, Inc. and ABN AMRO Mortgage Group, Inc. merged, with CitiMortgage, Inc. Successor by Merger to ABN AMRO Mortgage Group, Inc., as the surviving entity.

24.     Defendant Citibank Mortgage Reinsurance, Inc. is a subsidiary of Citigroup Inc. *See* Exhibit 13 (listing Citibank Mortgage Reinsurance, Inc. as a subsidiary of both CitiMortgage, Inc. and Citibank, N.A.).[4]  Citibank Mortgage Reinsurance, Inc. is an active

---

[4]     Although Citigroup Inc.'s 2010 and 2011 Forms 10-K do not specifically list Citibank Mortgage Reinsurance, Inc. as a subsidiary, both note that "the names of particular subsidiaries have been omitted because the unnamed subsidiaries, considered in the aggregate as a single

Vermont corporation and captive reinsurer regulated by the Vermont Department of Banking, Insurance, Securities and Health Care Administration.  *See* Exhibit 15 hereto (Vermont Secretary of State Corporation Information); Exhibit 16 hereto (excerpts from the 2008 Annual Report of the Vermont Insurance Commissioner Year Ended December 31, 2008); Exhibit 17 hereto (Comptroller of the Currency Corporate Decision #99-26, dated September 1999, approving Citibank, N.A.'s "application to establish a subsidiary that will reinsure mortgage insurance for loans made, purchased, or serviced by the Bank or the Citibank Lenders.").

**ABN Defendants**

25.     Defendant ABN AMRO Mortgage Group, Inc., formerly a subsidiary of LaSalle Bank Corporation and ABN AMRO Bank, N.V., was acquired by Citigroup Inc. on or about March 1, 2007.   ABN AMRO was a national originator and servicer of prime residential mortgages loans.   *See* Exhibit 18 (excerpts from Citigroup Inc.'s 2007 Form 10-K filed on February 22, 2008), at 8.

26.     Defendant AAMBG Reinsurance, Inc. is a subsidiary of Citigroup Inc.   *See* Exhibit 13 (Exhibit 21 to Citigroup Inc. 2008 Form 10-K filed on February 27, 2009).   AAMBG is an active Vermont Corporation and captive reinsurer regulated by the Vermont Department of Banking, Insurance, Securities and Health Care Administration.  *See* Exhibit 19 hereto (Vermont Secretary of State Corporation Information); Exhibit 16 hereto (excerpts from the 2008 Annual Report of the Vermont Insurance Commissioner Year Ended December 31, 2008).

---

subsidiary, would not constitute a 'significant subsidiary' (as the term is defined in Rule 1-02(w) of Regulation S-X . . . .").  *See* Citigroup Inc. Forms 10-K, Exhibit 21.01, for the years 2010 and 2011, included in Exhibit 13.

The Private Mortgage Insurers

27.     Defendant Radian is a Pennsylvania corporation headquartered in Philadelphia, PA, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Radian with the NAIC, Radian ceded premiums to Defendants AAMBG RE and Defendant Citibank Mortgage RE each and every year from and including 2004 up to and through 2011.

28.     Defendant Genworth is a North Carolina corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Genworth with the NAIC, Genworth ceded premiums to Defendants Citibank Mortgage RE and AAMBG RE, each and every year from and including 2004 up to and through 2011 (the last year for which Annual Statements filed with the NAIC are currently available).

29.     Defendant MGIC is a Wisconsin corporation headquartered in Milwaukee, WI, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by MGIC with the NAIC, MGIC ceded premiums to Defendants Citibank Mortgage RE and AAMBG RE, each and every year from and including 2004 up to and through 2011.

30.     Each Defendant is a proper party to this action as, upon information and belief, each Defendant participated in the scheme alleged herein and was a provider or recipient of the unlawful kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for the referral of private mortgage insurance or any portion of an unearned fee and, further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

31.     Non-Defendant PMI is an Arizona corporation headquartered in Walnut Creek, CA.  During the Class Period, PMI conducted business throughout the United States.  According to the Annual Statements filed by PMI with the NAIC, PMI ceded premiums to Defendants Citibank Mortgage RE and AAMBG RE each and every year from and including 2004 up to and through 2011.  Due to PMI's filing for Chapter 11 bankruptcy protection in Delaware on November 23, 2011, Plaintiffs have not named PMI as a defendant in this action.  Subject to the bankruptcy stay, Plaintiffs reserve all rights to add PMI as a defendant to this action.[5]

32.     Non-Defendant Republic is a North Carolina corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Republic with the NAIC, Republic ceded premiums to Defendants Citibank Mortgage RE and AAMBG RE each and every year from and including 2004 up to and through 2011 (the last year for which Annual Statements filed with the NAIC are currently available).

33.     Non-Defendant Triad is an Illinois corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States.  According to the Annual Statements filed by Triad with the NAIC, Triad ceded premiums to Defendants AAMBG RE and Defendant Citibank Mortgage RE, each and every year from and including

---

[5]     On August 19, 2011, the Director of the Arizona Department of Insurance issued an order placing PMI Mortgage Insurance Co. under supervision pursuant to § 20-169 of the Arizona Revised Statutes and requiring PMI Mortgage Insurance Co. to cease writing new commitments for insurance effective as of the close of business on August 19, 2011.  On October 20, 2011, the Director of the Arizona Department of Insurance obtained an interim "Order Directing Full and Exclusive Possession and Control of Insurer" with respect to PMI Mortgage Insurance Co. pursuant to § 20-172 of the Arizona Revised Statutes and, under the order, now has full possession, management and control of PMI Mortgage Insurance Co.  PMI Group, Inc., the parent company of PMI Mortgage Insurance Co., filed for Chapter 11 bankruptcy protection in Delaware on November 23, 2011.  On March 14, 2012, the Superior Court for the State of Arizona, Maricopa County, AZ entered a full receivership Order.

2004 up to and through 2011.  Defendant Triad Guaranty Insurance Corp. purportedly ceased issuing commitments for new business on July 15, 2008 and entered into voluntary run-off.  *See* http://www.tgic.com/.

34.     Non-Defendant UGI is a North Carolina corporation headquartered in Greensboro, NC, and, during the Class Period, conducted business throughout the United States. According to the Annual Statements filed by UGI with the NAIC, UGI ceded premiums to Defendant Citibank Mortgage Reinsurance, Inc., each and every year from and including 2004 up to and through 2010 (the last year for which Annual Statements filed with the NAIC are currently available).

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

36.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

37.     This Court also has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies

38.     RESPA is the primary federal law regulating residential mortgage settlement services and business activities incident to real estate settlement services.  For most of the Class Period, the United States Department of Housing and Urban Development ("HUD") was charged

with enforcing RESPA.  HUD promulgated the implementing rules for RESPA, Regulation X, 24 C.F.R. § 3500.

39.     Since July 21, 2011, the Consumer Financial Protection Bureau ("CFPB"), which was established by the Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), 12 U.S.C. §§ 5481(12)(M), 5514(b)-(c), and 5515(b)-(c) has administered and enforced RESPA.

40.     Congress enacted RESPA, in part, to curb kickbacks among real estate agents, lenders and other real estate settlement service providers and/or providers of business incident to real estate settlement services: "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

41.     Central to RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services, found in Sections 8(a) and 8(b).

42.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

43.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

44.     Regulation X, RESPA's implementing regulation, further provides that, "[a] charge by a person for which no or nominal services are performed or for which duplicative fees

are charged is an unearned fee and violates this section."  24 C.F.R. § 3500.14(c).

45.     In addition, the term "thing of value," as used in RESPA Section 8(a), 12 U.S.C. §

2607(a), is broadly defined, and is described in Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity. . . .  The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24 C.F.R. § 3500.14(d).

46.     Private mortgage insurance business referred to a private mortgage insurer by a

lender constitutes "business incident to or a part of a real estate settlement service" within the

meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in

RESPA and Regulation X and explicitly includes the "provision of services involving mortgage

insurance." 24 C.F.R. § 3500.2(b).

47.     Under RESPA, therefore: (i) the Citi Defendants and the ABN Defendants were

prohibited from accepting referral fees from a Private Mortgage Insurer and from splitting

private mortgage insurance premiums with any Private Mortgage Insurer other than for

reinsurance services actually performed by Citibank Mortgage RE and AAMBG RE,

respectively; and (ii) the Private Mortgage Insurers were prohibited from paying referral fees to

the Citi Defendants and the ABN Defendants, or from paying to them any split of private

mortgage insurance premiums other than for services actually performed by Citibank Mortgage

RE and AAMBG RE, respectively.

### The Private Mortgage Insurance Industry and Mortgage Reinsurance

48.     The private mortgage insurance industry began with the founding of Defendant

Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and several other private mortgage insurers, including the Defendant Private Mortgage Insurers—Radian, Genworth, and non-Defendants PMI, Republic, Triad and UGI.  Generally, trade association Mortgage Insurance Company of America ("MICA") represents the industry. According to its website, MICA's members include each of the Private Mortgage Insurers, with the exception of UGI, and new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007.  *See* http://www.privatemi.com/about.cfm.

49.      Each of the Private Mortgage Insurers provides or provided mortgage insurance for the protection of Citi and/or ABN and was a party to a reinsurance agreement with Citibank Mortgage RE and/or AAMBG RE.

50.      By way of background, residential mortgage lenders typically prefer to finance no more than 80% of the value of a home, with the remaining 20% being paid as a down payment by the borrower.  However, many potential homebuyers cannot afford to pay 20% of their home's purchase price as a down payment.  Private mortgage insurance, which protects the lender in the event of a default by the borrower, allows the lender to make a loan in excess of 80% of the home's value by providing a guarantee from a dependable third party—the private mortgage insurance provider.  *See* Exhibit 20 at 1-2.

51.      Providers of private mortgage insurance are typically third-party companies that, in the event of default, agree to cover the first twenty to thirty percent of the amount of the potential claim for coverage, including unpaid principal, interest and certain expenses.

52.      While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance either: (i) directly through the addition of monthly premiums to

the borrower's monthly mortgage payment; or (ii) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

53.     Borrowers, like Plaintiffs, generally have no opportunity to comparison-shop for private mortgage insurance.  Instead, the private mortgage insurance is arranged by the lender. Moreover, the terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the private mortgage insurance provider, rather than negotiated between the borrower and the private mortgage insurance provider.

54.     Reinsurance is a common business practice in the insurance industry whereby primary insurers pay other insurers (reinsurers) to insure a portion of the risk the primary insurer has agreed to cover.

55.     Mortgage reinsurance arrangements can generally take one of two forms: "quota share" or "excess-of-loss."

56.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences a loss, the reinsurer is expected to experience a loss in the percentage agreed upon in the reinsurance contract.

57.     In an excess-of-loss reinsurance arrangement, the reinsurer is liable only for a specified "band" of loss, with losses below and above the band covered by the primary insurer. In other words, the reinsurer is liable only for claims (or a percentage thereof) above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, the reinsurer's potential liability begins, if ever, only when the primary insurer's incurred losses reach the attachment point, and

ends when such losses reach the detachment point.

<u>HUD Notes the Potential for RESPA Violations Under Captive Reinsurance Arrangements</u>

58.    In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  In the mid-1990s, however, mortgage companies began looking for ways to capitalize on the booming private mortgage insurance market.  *See* Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance,* Mar. 23, 1998), http://www.captive.com/service/milliman/article3_ mortgage.shtml, attached as Exhibit 21.  In order to "share in these profits," many lenders created captive reinsurance subsidiaries to enter into contracts with private mortgage insurance providers, whereby the reinsurer typically agreed to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  In return for a steady stream of business from the lender's referral of borrowers, a private mortgage insurer ceded to the lender's affiliated captive reinsurer a portion of the premiums it received from such borrowers.

59.    In 1997, HUD was the federal entity primarily responsible for interpreting and enforcing RESPA.  Concerned that lenders' captive reinsurance arrangements with private mortgage insurers would be designed to disguise a funneling of referral fees back to the lender that had arranged for the private mortgage insurer to obtain business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the potential problem posed by lenders' captive reinsurers and RESPA's anti-kickback and improper fees provisions.  *See* Exhibit 22, HUD Letter.

60.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed,' and (2) are bona fide compensation that

does not exceed the value of such services." *Id.* at 3.

61.     The HUD letter evaluates potential violations of RESPA Section 8(a) & (b) based upon whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "[t]he reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id.* at 6.

62.     The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement" provided that "the reinsurer is bound to participate pro rata in every claim." *Id.*[6]

63.     The HUD letter states that excess-of-loss private mortgage reinsurance contracts can escape characterization as an unlawful referral fee or fee-split ***only if***:

> [T]he band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid . . . must be commensurate with the risk.

*Id.* at 3.  In other words, even if there is some transfer of risk, the reinsurance arrangement will still violate RESPA if the amount paid (*e.g.,* the premiums ceded) is not commensurate with the risk transferred.[7]

---

[6]     As noted below at ¶74, even quota share arrangements to reinsure private mortgage insurance do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the private mortgage insurers have no recourse against the reinsurer.

[7]     As explained above, the CFPB administers and enforces RESPA.  *American Banker* recently reported that the CFPB has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme—the same type of scheme described

<u>Regulatory, Accounting and Actuarial Standards Require Real Risk Transfer and a
Reasonable Possibility of Significant Loss in Private Mortgage Reinsurance</u>

64.     Accepted accounting and actuarial principles determine whether a reinsurance
arrangement, like those at issue here, represent a "real transfer of risk," including for purposes of
RESPA. These principles provide that, for a contract to be treated as real reinsurance, the
reinsurer must assume significant insurance risk and it must be "reasonably possible that the
reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer
Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations,
Casualty Actuarial Society Forum, Winter 2006, at 282-283, attached hereto as Exhibit 24; *see
generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for
Reinsurance of Short-Duration and Long-Duration Contracts," at 7 (December 1992), attached
hereto as Exhibit 25.  The reinsurance arrangements at issue in this action violated RESPA
because they foreclosed the reasonable possibility that Citibank Mortgage RE and AAMBG RE
"may realize a significant loss."

65.     Insurers and reinsurers are subject to two sets of accounting standards in the
United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting
principles (GAAP)."  *See* Exhibit 26 hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk
Financing in the US and the EU:A Comparative Analysis of Alternative Regulatory Approaches,*
The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by
state insurance regulators through the NAIC, and insurers are required to file detailed financial
statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the

---

herein.  The investigation is the CFPB's first known formal investigation of any kind.  *See* Jeff
Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American Banker (Jan. 10,
2012, 4:31 PM), http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-
1.html, attached as Exhibit 23.

Financial Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission (SEC) reports." *Id.*

66.     FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that have the formal appearance of reinsurance but do not transfer significant insurance risk and thus should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting."  *See* Exhibit 24 at 282-83.

67.     Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

> 1.     It must be evident that "the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts" (paragraph 11), or
>
> 2.     The reinsurer must "assume significant insurance risk under the reinsured portions of the underlying insurance contracts" (paragraph 9a) and it must be "reasonably possible that the reinsurer may realize a significant loss from the transaction" (paragraph 9b).

*Id*. at 283; *see generally* Exhibit 25 at 7.

68.     The test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if: (i) the reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts; and (ii) it is reasonably possible that the reinsurer may realize a significant loss from the transaction.  *Id.* at 7.

69.     Further, FAS 113 provides the blueprint for how to structure a "real risk transfer"

analysis:

> The ceding enterprises' evaluation of whether it is reasonably
> possible for a reinsurer to realize a significant loss from the
> transaction shall be based on the present value of all cash flows
> between the ceding and assuming enterprises under reasonably
> possible outcomes, without regard to how the individual cash flows
> are characterized.  The same interest rate shall be used to compute
> the present value of cash flows for each reasonably possible
> outcome tested.
>
> Significance of loss shall be evaluated by comparing the present
> value of all cash flows . . . with the present value of the amounts
> paid . . . to the reinsurer.

*Id.* at 7.

70.     SSAP 62R's test for whether a reinsurance contract effectuates a real risk transfer

is substantively identical:[8]

> a.      The reinsurer assumes significant insurance risk under the
> reinsured portions of the underlying insurance agreements; and
>
> b.      It is reasonably possible that the reinsurer may realize a significant
> loss from the transaction.

*See* Exhibit 27 hereto at paragraph 13, SAP 62R-6 (NAIC Accounting Practices & Procedures

Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and

Casualty Reinsurance, Exhibit 1 "Implementation Questions and Answers").[9]

---

[8]     "The above provisions of SSAP 62 are essentially the same as those in FAS 113."  *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, available at http://www.actuary .org/pdf/casualty/risk_transfer.pdf.

[9]     *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably possible if its probability is more than remote.").

71.     Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits."  *See* Exhibit 25 at 4; *see generally* Exhibit 28 hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

72.     In a deposit accounting/no-risk transfer arrangement, payment from a reinsurance trust to a primary insurer is a "loss" to the primary insurer, ***but not the reinsurer***— it is akin to a withdrawal from a traditional bank savings account.  Payment of "claims" under a deposit accounting "reinsurance" arrangement is specifically anticipated, and accounting for such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules than those that apply to true reinsurance.  *See* Exhibit 27 at paragraph 35, SAP 62R-11 at (b) (referencing "disbursements"), (e) (referencing "settlement of losses"), and (f) (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit 29 (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph (b), referencing "disbursements," paragraph (d), referencing "settlement of losses," and paragraph (e), referencing loss and loss adjustment expense)).

73.     In addition, at least one state regulator has explicitly concluded that no real transfer of risk exists where reinsurance agreements include liability-limiting provisions or lack sufficient recourse provisions to ensure that the reinsurer lives up to its commitments.  The State of Arizona Department of Insurance has made clear its view that mortgage reinsurance arrangements with any or all of the following characteristics ***result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines"***:

- where there are unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds.

*See* Exhibit 30 hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers) (emphasis added).

74.     In sum, under the foregoing principles, a purported reinsurance arrangement—quota share or excess-of-loss—does not constitute real reinsurance if: (i) the reinsurance contract limits the reinsurer's liability to pay claims to the amount of assets held in the trust accounts established for each mortgage insurer and into which the mortgage insurer deposits the ceded portion of the premium collected from borrowers; (ii) the reinsurer puts no or merely nominal capital into the trust accounts; or (iii) the private mortgage insurer has no recourse against the reinsurer.  Indeed, as noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap . . .*** a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit 31 hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).   Similarly, for a private mortgage insurance reinsurer subject to an excess-of-loss contract to be exposed to any real losses (as opposed to merely paying claims from ceded premiums), two circumstances must exist: (i) the amount of losses paid by the private mortgage

insurer must reach the band where the reinsurer's responsibility to pay claims attaches; and (ii) the reinsurance agreement between the reinsurer and the private mortgage insurer must contain provisions ***requiring*** the reinsurer to contribute its ***own*** money to pay its share of losses when called upon by the primary private mortgage insurer.

75.     In contrast, a reinsurance arrangement between a reinsurer and a private mortgage insurer that does not expose the reinsurer to any real possibility that it may be required to contribute its own money—and thereby experience real insurance "losses"—when called upon to pay claims by the private mortgage insurer, does not constitute actual risk-transferring reinsurance, but is a sham which contravenes RESPA.  *See* ¶¶58-63.  As set forth below, Citibank Mortgage RE's and AAMBG RE's agreements with the Private Mortgage Insurers did not involve a real transfer of risk and the ceded premiums paid pursuant thereto were kickbacks and referral payments that violated RESPA.

<u>Citi's and ABN's Captive Reinsurance Arrangements with the Defendant Private Mortgage Insurers Violated RESPA</u>

76.     During the Class Period, in connection with the millions of dollars in home loans originated, funded and/or originated through correspondent lending by Citi and ABN, many of Citi's and ABN's borrowers paid for private mortgage insurance.

77.     Also during the Class Period, Citibank Mortgage RE and AAMBG RE were parties to captive reinsurance arrangements with each of the Private Mortgage Insurers that violated RESPA's kickback and improper fees provisions.  Pursuant to these virtually identical arrangements, Citi and ABN referred borrowers to the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with Citibank Mortgage RE and AAMBG RE under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to Citibank Mortgage RE and AAMBG RE.   Citi and ABN allocated their referrals of borrowers to

the Private Mortgage Insurers on a systematic, rotating basis which was not based upon quality of service, price, reputation, performance or any other appropriate, objective metric among the Private Mortgage Insurers.   Defendants' coordinated actions reduced competition in the mortgage insurance market and increased premiums for Plaintiffs and the Classes in violation of RESPA.  *See generally* 12 U.S.C. § 2601(b).

78.   Citibank Mortgage RE and AAMBG RE entered into reinsurance contracts with each of the Private Mortgage Insurers solely with respect to loans originated, funded, and/or originated through correspondent lending by Citi and ABN during the Class Period.  *See* Exhibit 17.   Such agreements were in the form of purported aggregate excess-of-loss reinsurance contracts or quota share reinsurance contracts.

79.   Under each of Citi's and ABN's captive reinsurance arrangements, the Private Mortgage Insurer pays Citibank Mortgage RE and AAMBG RE a percentage of the premiums (upon information and belief, up to 40 percent of the premium) paid by borrowers on a particular pool of loans, and in return, Citibank Mortgage RE and AAMBG RE purportedly agree to assume a portion of the insurer's risk of loss with respect to the loans involved.

80.   Under its purported reinsurance contracts, Citibank Mortgage RE and AAMBG RE established a separate trust for each Private Mortgage Insurer into which the Insurer deposited the contractually-determined ceded portions of the premiums that it collected from Citi's and ABN's borrowers on the particular pool of loans at issue.  That is, Citi and ABN both established a trust account for each Private Mortgage Insurer to hold the funds that were to be used under the reinsurance contract associated with the particular trust account to pay claims on that pool of loans at issue.  *See, e.g.,* Exhibit 20 at 4.

81.   Premiums were ceded into the supporting trusts on a "book year" basis, as

described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements:

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

*See* Exhibit 20 at 3.

82.     Thus, all claims under Citibank Mortgage RE's and/or AAMBG RE's contract with a particular Private Mortgage Insurer could be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *See id.*

83.     Moreover, upon information and belief, when certain trust reserve requirements were met, the funds in the trust were released as dividends to Citibank Mortgage RE and/or AAMBG RE and to their respective parents, Citi and ABN.  Thus, the ceded private mortgage insurance premiums deposited into the trusts remain there until they are paid out to cover claims or administrative expenses, or released as a dividend to Citibank Mortgage RE and/or AAMBG RE.

84.     In addition, upon information and belief, Citi's and ABN's contracts with the Private Mortgage Insurers were designed to limit their liability or payment responsibilities under the contracts through provisions that permitted Citibank Mortgage RE and AAMBG RE to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting any reinsurance contract.

85.     As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could

> fund its stake with incoming premiums.  If the deal went bad, the
> bank could walk away and leave the insurer to cover its losses.
> Conceptually, such arrangements are analogous to letting a
> gambler with $10 in casino chips place a $100 bet at a blackjack
> table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

86.     In other words, if Citibank Mortgage RE and AAMBG RE elected not to maintain
the required funds in a trust (as, upon information and belief, they decided here), once the trust
was depleted, Citibank Mortgage RE and AAMBG RE bore no further risk and the mortgage
insurer assumed any remaining obligations—no matter if the funds in the trusts were insufficient
to cover the amount of "losses" the captive reinsurer had contracted, and been paid, to cover.
The absence of such recourse distinguishes Citi's and ABN's unlawful captive reinsurance
contracts from true mortgage reinsurance contracts.

87.     Citibank Mortgage RE and AAMBG RE were facially required, pursuant to their
contracts with the Private Mortgage Insurers, to maintain through, *inter alia*, capital infusions
and ceded premiums, each trust fund's net assets at a level required by state law to fund claims
made under the reinsurance contracts.  However, also under the reinsurance contracts, Citibank
Mortgage RE's and AAMBG RE's potential exposure for payment of reinsurance claims is
limited to the amount held in the trust account established for each Private Mortgage Insurer, and
funded by premiums ceded by the respective Private Mortgage Insurer.  This effectively insulates
Citibank Mortgage RE and AAMBG RE from liability for failing to maintain the trusts at a level
sufficient to pay claims and leaves the Private Mortgage Insurers with no recourse to Citibank
Mortgage RE and AAMBG RE.

88.     Consequently, Defendants' captive reinsurance arrangements do not constitute
real, risk-transferring reinsurance between Citibank Mortgage RE and AAMBG RE and the
Defendant Private Mortgage Insurers in light of the standards set forth above in ¶¶60-75.

89.     Instead, they violate RESPA.   As HUD noted during testimony by Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* Exhibit 32 hereto (April 26, 2006 testimony of Gary M. Cunningham).

90.     Such is the case with Citi and ABN.   As reflected in the chart below, from the beginning of 2004 through the end of 2011, Citibank Mortgage RE collected from the Private Mortgage Insurers at least **$150.6** million as its "share" of borrower's private mortgage insurance premiums.   In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $36.8 million, as depicted in the chart below:[10]

---

[10]     These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2011.  Plaintiffs' investigation is ongoing.



91.     Similarly, from the beginning of 2004 through the end of 2011, AAMBG RE collected from the Private Mortgage Insurers at least $210.3 as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $11.2 million, as depicted in the chart below:



92.     As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable in the event of a real estate collapse."  Moreover, "the

fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks." *See* Reinsurance Kickbacks.

93.     Indeed, the mere fact that Citibank Mortgage RE and AAMBG RE paid claims from the trust accounts does not establish that the underlying reinsurance contracts constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.  Instead, upon information and belief, even after paying some claims, due to the structure of the reinsurance agreements, Citibank Mortgage RE and AAMBG RE continued to carry no true risk of loss, as defined in the applicable standards and regulations addressed above in ¶¶60-75, and the premiums received by Citibank Mortgage RE and AAMBG RE were not commensurate to any risk that Citibank Mortgage RE and AAMBG RE purportedly assumed.

94.     In fact, payments from the reinsurance trusts maintained by Citibank Mortgage RE and AAMBG RE to the Private Mortgage Insurers do not constitute "losses" to Citibank Mortgage RE and AAMBG RE because, upon information and belief, under the terms of the underlying agreements, Citibank Mortgage RE and AAMBG RE will either: (i) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in purported reinsurance claims; or (ii) have the option to walk away from their purported reinsurance obligations if they are called upon to pay more in claims than is available in the trust accounts.  The premiums ceded from the Private Mortgage Insurers and deposited into the trust accounts effectively constitute the only funds available to cover reinsurance claims payments.

95.     Further, as set forth above at ¶61, the HUD Letter statement that "there is no reasonable expectation that the ***reinsurer*** will ever have to pay claims" does not mean that when the ***first claim*** is paid out of a reinsurance trust, real risk is transferred.  *See* HUD letter, Exhibit

22 at 6 (emphasis added).   In the circumstances of this action, that ***first claim***, by definition, would be paid out of the premiums placed into the trust by the ceding Private Mortgage Insurer. Citibank Mortgage RE and AAMBG RE would only pay after ceded premiums were exhausted. They would not suffer reinsurance "losses" in a risk transfer sense until their own capital was utilized, and not "repaid" through dividends or otherwise.   Until then, payments from the reinsurance trusts are funded by premiums ceded by the Private Mortgage Insurers.

96.   To the extent, then, that claims have been paid from the reinsurance trusts under Citibank Mortgage RE's and AAMBG RE's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish a *bona fide* risk-transferring reinsurance arrangement, nor does it establish that Citi or ABN have suffered a true reinsurance "loss."   In fact, the structure of the reinsurance contracts themselves and their missing essential terms negate any exposure to reinsurance losses, rendering the arrangements a sham.

97.   The over $360.9 million dollars in "reinsurance" premiums paid by the Private Mortgage Insurers and collected by Citi and ABN, combined, through their captive reinsurers through the end of 2011 have clearly not been commensurate to Citibank Mortgage RE's and AAMBG RE's actual risk exposure.

98.   The money which Citi and ABN collected from the Defendant Private Mortgage Insurers through Citibank Mortgage RE and AAMBG RE far exceeded the value of the services, if any, Citibank Mortgage RE and AAMBG RE performed.   There was no real transfer of risk or, at least, not a commensurate transfer of risk given the vast disproportion between the amount of premium ceded to Citibank Mortgage RE and AAMBG RE and the contractual limitations on Citibank Mortgage RE's and AAMBG RE's actual obligations.   Instead, the amounts paid to Citibank Mortgage RE and AAMBG RE were simply disguised kickbacks and unearned fees to

Citi and ABN for the referral of borrowers to the Defendant Private Mortgage Insurers.

99.     Each and every premium already ceded to Citibank Mortgage RE and AAMBG RE by the Private Mortgage Insurers, as well as each and every premium that they will continue to cede to Citibank Mortgage RE and AAMBG RE in the future, constitutes a separate illegal kickback and/or referral fee split "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).

The Private Mortgage Insurers' RESPA Violations With Respect to Captive Mortgage Reinsurance Arrangements

100.    The Private Mortgage Insurers acceded to and willingly participated in Citi's, ABN's and other such captive reinsurers' arrangements because it would have been economically self-defeating for them not to do so. Moreover, within the national mortgage insurance landscape, upon information and belief, all the large mortgage lenders entered into virtually identical arrangements with all or a subset of the Private Mortgage Insurers. Thus, each benefited from the captive reinsurance arrangements prevalent across the industry. Participation ensured business and a profit stream. In effect, each of the Private Mortgage Insurers agreed not to compete with each other, and they all benefitted from their agreement both with Citi and ABN, and with respect to their agreements with the other major lenders.

101.    Defendants' arrangement involving unlawful kickbacks and fee payments occurred against a backdrop of widespread, similar unlawful practices in the settlement services industry that have recently received regulatory and press attention.

102.    Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that—as alleged herein—"banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank

underwriters."

103.     *American Banker* reported that GE Capital Mortgage Insurance (a predecessor of Genworth) described lenders' aggressive pursuit as "feeding the beast" in a 1999 Power Point presentation to one lender obtained by HUD investigators.  *See* Reinsurance Kickbacks.  In the presentation, Genworth warned that "the MI Industry and lenders won't be able to defend/sustain these structures." *Id*.

104.     Unsurprisingly, numerous government and private investigations and actions have targeted the unlawful private mortgage insurance and reinsurance practices described herein. Agreements or understandings such as those engaged in by Defendants have been the subject of subpoenas from states, including Minnesota and New York, as well as the CFPB and HUD.  *See* Exhibit 23.

105.     In particular, the CFPB is currently engaged in an industry-wide investigation of captive reinsurance of private mortgage insurance, including major lenders and all the private mortgage insurance providers.   It has issued subpoenas and civil investigative demands to significant participants in furtherance of its investigation into this nationwide practice.   These have included, to date, subpoenas or civil investigative demands to American International Group (UG), Genworth, MGIC and PHH Mortgage.[11]   These investigations are ongoing and

---

[11]     *See, e.g.*, Maya Jackson Randall, *Consumer Bureau Sets Mortgage-Insurer Probe,* Wall Street Journal (Aug. 5, 2012, 8:53 PM), http://online.wsj.com/article/SB100008723963904442 46904577571753451048664.html, attached as Exhibit 33 hereto; Daniel Wagner, *Mortgage Insurance Investigated for Possible Kickback Deals,* USA Today (Aug. 3, 2012, 6:43 PM), http://www.usatoday.com/money/industries/banking/story/2012-08-03/consumer-probe-mortgage-ins, attached as Exhibit 34 hereto; Exhibit 35 hereto at 64 (excerpts from American International Group, Inc.'s Form 10-Q for the quarterly period ended June 30, 2012; Exhibit 36 hereto at 75 (excerpts from Genworth Financial, Inc.'s Form 10-Q for the quarterly period ended June 30, 2012); Exhibit 37 hereto at 20, 101, 110 (excerpts from MGIC Investment Corp.'s Form MGIC 10-Q for the quarterly period ended June 30, 2012; Exhibit 38 hereto at 59 (excerpts from Radian Group Inc.'s Form 10-Q for the quarterly period ended June 30, 2012).

likely to spawn further discovery demands by the CFPB.

106.    The chart below reflects the top ten captive reinsurers in the country based on the premiums ceded to the lenders' captive reinsurance subsidiaries and billions or hundreds of millions of dollars of private mortgage insurance premiums which private mortgage insurers ceded to them from 2004-2010.



107.    Adding detail to the information above, the following chart illustrates that these captive reinsurers received 82.2% of the total reinsurance premiums ceded by private mortgage insurers from 2004 through 2010.



108.    Each and every one of the top ten captive reinsurers (and/or their lender
sponsor/parents) identified in the chart above to serve as repositories for ceded
premiums/kickbacks have now been sued by consumers who have alleged that captive
reinsurance entities were merely vehicles through which the lenders were able to funnel profits in
the form of kickbacks while taking on little or no risk, as can be graphically depicted as follows:



109.    Milliman ("Milliman") is an actuarial company which, upon information and
belief, provided actuarial services to most (if not all) of the top lenders and their captive
reinsurers with regards to these captive reinsurance arrangements.  Milliman actively promoted
the establishment of lender captive mortgage reinsurance entities as a money-making enterprise
for mortgage lenders.  *See* Exhibit 21.  As Milliman acknowledged, if everything went as
planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the
expected level, the above arrangement, from the lender's perspective, is financially equivalent to
receiving a commission or profit sharing equal to a percentage of premium." *See id*.

110.    Milliman was correct:  upon information and belief, under the terms of the
virtually identical reinsurance contracts entered into between the private mortgage insurers and

each of the top ten lender captive reinsurers in the country, and like the Citi and ABN contracts alleged herein, the lenders were protected from any liability beyond their initial capital infusion and bore no real risk.   Most significantly, each of these reinsurance contracts contained "termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision vis-à-vis the parent-lender to ensure that the PMI reinsured through termination would indeed continue to be reinsured—effectively allowed the reinsurer to opt out of the scheme at its choosing and without suffering adverse consequences.   For instance, in a suit against Wells Fargo & Company, Wells Fargo Bank, N.A. and North Star Mortgage Guaranty Reinsurance Company (collectively, "Wells Fargo"), involving the same claims as those advanced here, Wells Fargo provided the court with copies of contracts that its captive reinsurer entered into with two of the nation's seven major private mortgage insurers, each of which includes provisions limiting Wells Fargo's exposure to risk.   *See* Revised Reinsurance Agreement (Excess Layer) between Republic Mortgage Insurance Company and North Star Mortgage Guaranty Reinsurance Company, dated Mar. 12, 2001, attached hereto as Exhibit 39, at Section 9.03 and Section 12.07; Reinsurance Agreement (Excess Layer) between Radian Guaranty, Inc. and North Star Mortgage Guaranty Reinsurance Company, dated March 1, 2000, attached hereto as Exhibit 40, at Section 9.03, Section 12.06; Amendment Dated March 29, 2000 to Reinsurance Agreement (Excess Layer) between Radian Guaranty Inc. and North Star Mortgage Guaranty Reinsurance Company at Section 12.11, attached hereto as Exhibit 41.

111.   When asked to opine on contracts like those cited above with non-recourse and liability-limiting provisions in the analogous *Moore v. GMAC Mortg., LLC,* No. 07-cv-04296 (E.D. Pa.) action, Andrew Barile, a noted reinsurance industry expert, stated that he had never, "in all [his] years of experience," seen reinsurance agreements with non-recourse/trust cap terms

similar to those in the reinsurance agreements between the lender captive reinsurer and the Private Mortgage Insurers. *See* Defendants' Reply In Support of Motion to Compel Plaintiffs' Experts to Produce Documents at 7, *Moore v. GMAC Mortg., LLC,* No. 07-cv-04296 (E.D. Pa. Oct. 12, 2010), ECF No. 144.

112.    Moreover, in cases challenging the same exact type of agreement or understanding, as is alleged herein against Citi and ABN, lenders have conceded that a borrower's private mortgage insurer is selected on a rotating or similar basis. For instance, in a similar case brought against Countrywide Fin. Corp., its mortgage lender and its captive reinsurer, the Third Circuit noted:

> Countrywide generally requires borrowers who do not put twenty percent down when buying a home to purchase PMI from one of seven (now six) PMI providers. The borrower pays the PMI premiums, even though the mortgage lender is the beneficiary of the policy, and generally has no opportunity to comparison-shop for PMI lenders. Instead, the PMI provider is selected by the lender, here on a rotating basis among the seven providers, all of whom had allegedly agreed with Countrywide to reinsure with Balboa.

*Alston v. Countrywide Fin. Corp.,* 585 F.3d 753 at n.3 (3d Cir. 2009). *See also* Transcript of Class Certification Hearing at 11-13, *Moore,* No. 07-cv-04296 (Mar. 2, 2010), attached as Exhibit 42 (acknowledging that the assignment of borrowers to the private mortgage insurers was done on a rotating basis); Defendants' Reply Memorandum of Points and Authorities in Support of Motion to Stay at 2, *Munoz v. PHH Corp.,* No. 08-cv-00759 (E.D. Cal. Aug. 19, 2011), ECF No. 164 (stating that the *Munoz* action is "identical" to the *Moore* action); Defendants' Reply in Support of Motion to Compel Plaintiffs' Experts to Produce Documents at 1-2, *Moore,* No. 07-cv-04296 (E.D. Pa. Mar. 12, 2010), ECF No. 144 (noting that all of the captive reinsurance cases are "nearly identical" and that the *Liguori v. Wells Fargo & Co.,* No. 08-cv-000479 (E.D. Pa.) action is "virtually identical" to the *Moore* action).

113.    Defendants, along with other lenders, their captive reinsurers, and the private mortgage insurers involved in similar agreements or understandings, continued their conduct in violation of RESPA through at least 2008.  The "brakes" were only applied to this ongoing activity after Freddie Mac's announcement that, effective June 1, 2008, it would limit the percentage of premiums a mortgage insurance provider could cede to a lender's captive reinsurer to 25%.[12]  This limitation clearly contributed to the decline in profits for Citi and ABN, and other lenders and their captives who, upon information and belief, were receiving a much higher percentage of ceded premiums until that point in time.

114.    Nonetheless, these arrangements have tended to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums have not been paid to cover actual risk, but, rather, to fund illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for **both** actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.[13]

115.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers and in contravention of the stated purpose of RESPA.

---

[12]    *See* Exhibit 43 attached hereto (Freddie Mac Private Mortgage Insurer Eligibility Requirements, dated January 2008).  *See also* http://www. freddiemac.com/news/archives/corporate/2008/20080214_capture.html.

[13]    Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed. "Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded. *See* Reinsurance Kickbacks.

TOLLING OF STATUTE OF LIMITATIONS

116.    Prior to and throughout the Class Period, Defendants participated in and were parties to an agreement or understanding pursuant to which Defendants continually violated RESPA by funneling kickbacks to Citibank Mortgage RE and/or AAMBG RE and represented that such payments were for services actually performed, rather than for referral fees. Defendants further engaged in a course of conduct that included numerous affirmative misleading and deceptive acts aimed to conceal these violations from Plaintiffs and members of the Classes and to prevent Plaintiffs and the members of the putative Classes from discovering the underlying basis for their claims despite the exercise of due diligence.

117.    The statutes of limitations applicable to the claims asserted herein should be tolled based upon the principles of equitable tolling.  Any delay by Plaintiffs or the other putative members of the Classes is excusable and, accordingly, it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any member of the Classes.  For Plaintiffs and other members of the Classes whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply.

118.    Prior to and throughout the Class Period, Defendants engaged in numerous affirmative acts and made false and/or misleading representations and assurances about the captive reinsurance arrangements to conceal the facts and circumstances giving rise to the claims asserted herein, including, *inter alia*: (i) using form mortgage documents, disclosures and affiliated business arrangements to misrepresent and conceal the nature of the reinsurance arrangements, the relationship of the parties thereto and to conceal information about those parties from Plaintiffs; (ii) concealing from and/or misrepresenting information regarding the

41

true nature and purpose of the agreement or understanding alleged herein; (iii) intentionally providing incomplete, inaccurate and/or misleading information to Plaintiffs and to the other members of the putative Classes; and (iv) providing incomplete and/or inaccurate information to regulators and analysts.  Such acts were separate and distinct from the Defendants' conduct that violated RESPA and were undertaken to conceal those violations.

119.    Defendants used their form mortgage documents, disclosures of affiliated business arrangements, and the artifice of a seemingly legitimate business arrangement to affirmatively mislead members of the Classes about the relationship between Citibank Mortgage RE and Citi, and AAMBG RE and ABN, and/or to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses, or ceded to them from the Defendant Private Mortgage Insurers through referral, represented a *bona fide* transfer of risk.

120.    To start, at or around the time of their respective closings, borrowers received from Defendants a form mortgage document (the "Mortgage Document") and/or a Private Mortgage Guaranty Insurance Disclosure ("MI Document") from Citi (Exs. 46-48) and/or an Affiliated Business Arrangement Disclosure Statement ("Affiliate Disclosure") from ABN (Exs. 44-45) (collectively, the Mortgage Document, MI Document, and the Affiliate Disclosure are referred to herein as the "Form Documents"), each of which contained numerous similar affirmative misrepresentations intended to conceal Defendants' unlawful conduct and to erase any cause for concern or need to further investigate on the part of each borrower.

121.     For example, paragraph ten (10) of the Mortgage Document presented to each Plaintiff[14] stated, in relevant part:

> *Borrower is not a party to the Mortgage Insurance.*
>
> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that *share or modify their risk, or reduce losses . . . .*
>
> As a result of these agreements, Lender . . . may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of the Borrower's payments for Mortgage Insurance, *in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer*, the arrangement is often termed "captive reinsurance."
>
> **(a)  Any such arrangements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance**….
>
> **(b)   Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance**….

*See, e.g.*, Exhibits 3-12 hereto (the Mortgage Document provided to each Plaintiff) (bold emphasis in original).  Upon information and belief, all borrowers who were required to purchase private mortgage insurance received the Mortgage Document regardless of whether their private mortgage insurance was ever reinsured.

122.     In addition, borrowers received the MI Document, which stated in relevant part that:

> The Mortgage Insurer which is providing Mortgage Insurance on

---

[14] While the Rulisons' Mortgage Agreement differed slightly in the wording, the discussion of the captive reinsurance arrangement in the Rulison's Mortgage Agreement  contained the same misrepresentations as the other Plaintiffs' Mortgage Documents.  Ex. 7 at ¶ 10.

your loan has a reinsurance relationship with a Reinsurance Company known as "Citibank Mortgage Reinsurance Inc." *Under this reinsurance relationship, Citibank Mortgage Reinsurance Inc. will assume a portion of the risk associated with the Mortgage Insurance on your loan and will receive a portion of the Mortgage Insurance premiums*.

* * *

**This reinsurance relationship does not increase your Mortgage Insurance premiums and does not affect the coverage or the conditions for cancellation of the Mortgage Insurance** [*i.e.*, the terms of the borrower's mortgage insurance].

*See, e.g.,* Exhibits 46-48 hereto.

123.    Both the Mortgage Document and the MI Document therefore affirmatively misrepresent that each borrower's respective insurer and lender may enter into a legitimate reinsurance arrangement which would have ***no practical effect or impact*** on the borrower's costs or loan terms, or on the borrower's mortgage insurance or settlement rights or obligations.  Upon information and belief, this language was intentionally designed to lull Plaintiffs and other members of the Classes into believing that any potential reinsurance of their private mortgage insurance would have no appreciable impact upon Plaintiffs' interests, as Defendants misrepresented that any reinsurance would not affect the borrower's:  (i) costs with respect to mortgage insurance; (ii) rights or entitlements with respect to mortgage insurance; or (iii) loan terms.  Instead, the Form Documents portray the potential reinsurance of a borrower's mortgage insurance as an insurance business transaction with which a borrower—"*not a party to the Mortgage Insurance*"—had no practical reason to be concerned.   Defendants thus lulled Plaintiffs into inaction with respect to the possible reinsurance of their private mortgage insurance.

124.    For instance, Defendants affirmatively misrepresented that the placement of a borrower's loan in the reinsurance program would not increase his premiums.  The Mortgage Document affirmatively states that any private mortgage insurance reinsurance "agreement" that would be entered into on the borrower's behalf:  (i) "*will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance*"; and (ii) "*will not increase the amount Borrower will owe for Mortgage Insurance.*"   These representations were false and misleading because Defendants' unlawful kickback and referral fee arrangement had the direct and broad effect of "increas[ing] unnecessarily the cost of" the settlement service, private mortgage insurance, on a market-wide basis.  *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 756 n.2, 758 (3d Cir. 2009) (noting that "the provision of mortgage insurance is a 'settlement service' within the meaning of" RESPA); *see also* 12 U.S.C. § 2601(b) ("kickbacks or referral fees . . . tend to increase unnecessarily the costs of certain settlement services.").

125.    This false representation was again repeated to borrowers in the Affiliate Disclosure, as borrowers were assured that:   "**The existence of a reinsurance treaty [***i.e.***, relationship] does not change the premium paid for your mortgage insurance.**"  *See, e.g.*, Exs. 44-45 (bold emphasis in original).

126.    The Form Documents each also contained the following language (or substantially similar language) that misrepresented and thus concealed the true nature and purpose of the agreement or understanding among the Defendants by misrepresenting to borrowers that any payments made or ceded from the premiums paid by borrowers for private mortgage insurance were in exchange for actual reinsurance—*i.e.*, the transfer of actual or commensurate risk to the reinsurer.  In this regard, the Form Document states:

> As a result of these agreements, Lender . . . may receive (directly
> or indirectly) amounts that derive from (or might be characterized

as) a portion of the Borrower's payments for Mortgage Insurance, *in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer*, the arrangement is often termed "captive reinsurance."

*See* Exs. 3-12 (emphasis added); *see also* Exs. 44-48.

127.    Likewise, the Affiliate Disclosure provided to ABN borrowers at the time of their respective settlements stated that:

> Mortgage Insurance companies sometimes enter into contracts called reinsurance treaties with other insurance companies.  Under this type of arrangement, the second insurance company, or the reinsurer, receives a portion of the premium paid for mortgage insurance ***in return for assuming a portion of the risk*** covered by the mortgage insurance.  The mortgage insurance company your loan is assigned to may have entered into or may in the future enter into a reinsurance treaty with AAMBG Reinsurance, a Vermont Corporation."   The disclosure further discloses "a business relationship with AAMBG Reinsurance," listing AAMBG Reinsurance as a wholly owned subsidiary of an affiliate of ABN AMRO Mortgage Group Inc."

*See, e.g.*, Exhibits 44-45 (emphasis added).

128.    In fact, despite representing to Plaintiffs that the purpose of the captive reinsurance arrangement was to "***shar[e] or modify[] the mortgage insurer's*** risk" and/or "***reduc[] losses***" associated with each Plaintiff's mortgage and that such an arrangement represented *bona fide* reinsurance, ***no*** real or significant risk was transferred.  Borrowers such as Plaintiffs ***were not informed*** that the captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by the Defendant reinsurer.   Defendants' misrepresentations about the legitimacy of their captive reinsurance arrangements in standardized mortgage and closing documents are acts of concealment separate and distinct from

Defendants' RESPA violations, and these independent acts misled Plaintiffs and other members of the putative Class.

129.    Upon information and belief, CitiMortgage and ABN also intentionally designed any disclosures they provided to their borrowers to conceal the information that would put borrowers on notice as to the actual relationship among Defendants within the ABN and Citi schemes and when and whether a borrower's loan was actually placed in the reinsurance arrangements.

130.    For example, the MI Documents provided to CitiMortgage borrowers similarly state that under the reinsurance relationship between Citibank Mortgage RE and CitiMortgage, Inc., Citibank Mortgage RE "will assume a portion of the risk associated with the Mortgage Insurance on your loan . . .," but then further recite "the mortgage insurance on [the] loan **may** be reinsured"—leaving borrowers uncertain as to whether their mortgage insurance would be reinsured or not. *See, e.g.*, Exs. 46-48.

131.    Significantly, these documents, along with the Mortgage Document, failed to put borrowers on notice that Citibank Mortgage RE and AAMBG RE were entities that CitiMortgage and ABN, respectively, created for the express purpose of collecting illegal kickbacks and referral fees from the Private Mortgage Insurer.  Nor were borrowers informed at the time of their respective closings which Private Mortgage Insurer was chosen, why that insurer was chosen, or whether their loans were actually reinsured.  Borrowers **were not informed** that the captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by Citibank Mortgage RE or AAMBG RE.

132.    As demonstrated by the foregoing allegations, this complex action is dissimilar to a RESPA case in which, for example, an attentive borrower may determine—from a careful

examination of his HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider.  The violations alleged herein were not evident on the face of any documentation provided to Plaintiffs or to other members of the Classes at the time of their closings or anytime thereafter before each obtained the assistance of counsel.  Instead, as alleged herein, Defendants affirmatively concealed their RESPA violations, which falsely assuring members of the Classes that any captive reinsurance arrangement would have no practical impact upon their rights or interests.

133.   The conduct described herein and Defendants' affirmative acts of concealment rendered it virtually impossible for Plaintiffs and other homeowners to uncover the basis for their potential claims.  Defendants' affirmative and deceptive acts lulled Plaintiffs and other members of the Classes into believing that there was no basis for any claim given the purported existence of a "legitimate" captive reinsurance arrangement.   Against the backdrop of Defendants' assurances (and reassurances) and affirmative acts of concealment, Plaintiffs and the other members of the putative Classes exercised reasonable due diligence in their efforts to discover and assert claims against Defendants before and after the discovery of their claims.

134.   For instance, Plaintiffs fully and diligently participated in their respective loan transactions and reviewed the documents presented to them.   Nothing contained in the documents provided to Plaintiffs put them on notice of their claims.  Indeed, as discussed above, the Form Documents affirmatively assured each Plaintiff and member of the putative Classes that he or she "was not a party to the [respective] Mortgage Insurance" and that any reinsurance relationship among the Defendants would have *no practical impact* upon his or her costs, premiums, loan terms, or mortgage insurance or settlement rights or obligations.

135.    Moreover, the Form Documents did not put Plaintiffs on notice that the reinsurance arrangements did not actually transfer risk.  Accordingly, Plaintiffs could not reasonably be tasked with further investigating and/or inquiring into the particulars of a relationship that they did not know existed, and that they were affirmatively assured had no bearing whatsoever on their rights.

136.    Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.  Until that time, Plaintiffs and the other members of the putative Classes had no basis upon which to believe that they should further investigate the validity of the undisclosed payments from the Defendant Private Mortgage Insurers to Citibank Mortgage RE/AAMBG RE for purported reinsurance.  Plaintiffs were not aware of any document or information, provided by Defendants or otherwise, that could have put them on notice of the *possibility* of their claims.

137.    Accordingly, any delay in Plaintiffs' commencement of litigation based upon the misconduct alleged herein was excusable because they did not discover, and reasonably could not have discovered, the basis for their claims absent specialized knowledge and/or assistance of counsel.  Once Plaintiffs did discover the possibility of their claims, each acted reasonably and pursued his or her claims in a timely manner (within one year of the date on which each became aware of the *possibility* of his or her claims) by filing this action and/or by taking part in this action as a member of the putative Classes for which Plaintiffs have also brought claims.

138.    As alleged above, the Menichinos' loan transaction took place on or around September 6, 2007.  The Menichinos were only put on notice of the *possibility* of their claims when they received a notice of investigation ("Notice") from Kessler Topaz Meltzer and Check LLP ("KTMC") on or around September 16, 2011.

49

139.    The Menichinos first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around October 10, 2011.

140.    The Menichinos each signed a written agreement regarding KTMC's legal representation on or around November 10, 2011.

141.    Prior to communicating with counsel, nothing that the Menichinos received from Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon their costs or loan terms, or on their mortgage insurance or settlement rights or obligations.

142.    Once the Menichinos discovered the underlying basis for the claims alleged herein, they contacted Citi to inquire about whether their loan was part of the captive reinsurance arrangement.  Mrs. Menichino first dialed Citi's customer service line on November 22, 2011 and chose the "private mortgage insurance" option from an automated list.  She spoke with a customer service representative named Saul (ID # 20369) who did not have knowledge of Defendants' reinsurance program even though he had worked for Citi for seven years.  However, he was able to advise Mrs. Menichino that Genworth was the mortgage insurance provider for her 2007 mortgage loan.  In a further effort to obtain information about the reinsurance of her mortgage insurance, Mrs. Menichino called Genworth.  The Genworth employee with whom Mrs. Menichino spoke, Kim Fowler, confirmed that the Menichino's loan was reinsured through

Citi and advised that the reinsurance arrangement is between the lender and Genworth and does not affect the amount paid for mortgage insurance.

143.    Mrs. Menichino continued her efforts to acquire information about Citi's reinsurance program, including two subsequent calls to Citi and conversations with two different Citi customer service representatives.   During the first call on December 30, 2011, Mrs. Menichino spoke with a customer service representative named Arti.   Arti did not have knowledge about Defendants' reinsurance program.   Mrs. Menichino called back on January 5, 2012 and spoke with a customer service representative who could not answer Mrs. Menichino's questions about the reinsurance of her private mortgage insurance.   Plaintiffs' counsel has requested and is waiting for confirmation that the Menichinos' mortgage insurance is included in the reinsurance program with Citibank Mortgage RE from counsel for Citi.

144.    As alleged above, Plaintiffs Sloley and Hamilton's loan transaction took place on or around March 24, 2005.   Plaintiffs Sloley and Hamilton were only put on notice of the *possibility* of their claims when they received a Notice  on or around May 4, 2012.

145.    Plaintiffs Sloley and Hamilton first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around May 23, 2012.

146.    Plaintiffs Sloley and Hamilton each signed a written agreement regarding KTMC's legal representation on or around June 1, 2012.

147.    Prior to communicating with counsel, nothing that Plaintiffs Sloley and Hamilton received from Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or

private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, **any practical impact** upon their costs or loan terms, or on their mortgage insurance or settlement rights or obligations.

148.   Once Plaintiffs Sloley and Hamilton discovered the underlying basis for the claims alleged herein, they contacted Citi on or around June 12, 2012 to inquire about whether their loan was part of the captive reinsurance arrangement.  At that time, Ms. Sloley asked the Citi representative if her mortgage insurance was part of the reinsurance program.  **She was told that her loan was not part of a reinsurance program.**  This information was wrong.  The mortgage insurance on Plaintiffs Sloley's and Hamilton's loan was included in the ABN captive reinsurance program, as confirmed by Plaintiffs' counsel.  Despite Ms. Sloley's diligence, she was unable to discover whether her mortgage insurance was included in the ABN reinsurance program with AAMBG RE.  Plaintiffs Sloley and Hamilton were only ultimately able to obtain this information with the assistance of counsel.

149.   As alleged above, Plaintiff Simonds' loan transaction took place on or around September 19, 2007.  Mr. Simonds was only put on notice of the *possibility* of his claims when he received a Notice on or around August 29, 2012.

150.   Mr. Simonds first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around September 11, 2012.

151.   Mr. Simonds signed a written agreement regarding KTMC's legal representation on or around October 8, 2012.

152.   Prior to communicating with counsel, nothing that Mr. Simonds received from

Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or private mortgage insurance; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

153.    Once Plaintiff Simonds discovered the underlying basis for the claims alleged herein, he called Citi's customer service number in October 2012 to inquire about whether his loan was part of the captive reinsurance arrangement.  He was provided no information in that regard.  Rick, the Citi representative, responded that he needed insurance because he did not put twenty percent down on the house.  The Citi representative did not know what reinsurance was and could not provide the information Mr. Simonds requested.  Mr. Simonds then called MGIC on October 10, 2012 in an attempt to determine whether his mortgage insurance was part of the ABN reinsurance program.  He was again unsuccessful.  Despite his diligence, Mr. Simonds was unable to learn whether his mortgage insurance was included in the ABN reinsurance program with AAMBG RE.  Plaintiffs' counsel has requested and is waiting for confirmation from counsel for Citi that Mr. Simonds' mortgage insurance was included in the ABN reinsurance program with AAMB RE.  Upon information and belief, Mr. Simonds' loan was reinsured with AAMBG due to the loan origination date and type of loan involved.

154.    As alleged above, Plaintiff Proffitt's loan transaction took place on or around October 24, 2005.  Mr. Proffitt was only put on notice of the *possibility* of his claims when he

received a Notice on or around May 4, 2012.

155.    Mr. Proffitt first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around May 22, 2012.

156.    Mr. Proffitt signed a written agreement regarding KTMC's legal representation on or around September 27, 2012.

157.    Prior to communicating with counsel, nothing that Mr. Proffitt received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or private mortgage insurance; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

158.    Once Plaintiff Proffitt discovered the underlying basis for the claims alleged herein, he called Citi on September 27, 2012 to inquire about whether his loan was part of the captive reinsurance arrangement.  A representative named Jayandan could not answer Mr. Proffitt's question about reinsurance, stating "I don't know anything about that."  Mr. Proffitt then called Radian to learn whether his loan was reinsured.  Shelly (or possibly Shirley) Moore confirmed that Radian carried the mortgage insurance for his loan.  She, too, was unable to answer any questions regarding reinsurance.  In fact, she acknowledged that she did not know what reinsurance was.  She told Mr. Proffitt, "I have no clue what you are talking about."

159.    Even with the assistance of counsel, Mr. Proffitt has been unable to confirm

whether his mortgage insurance was reinsured with AAMBG RE.  Plaintiffs' counsel has requested and is waiting for confirmation from counsel for Citi that Mr. Proffitt's mortgage insurance was included in the ABN reinsurance program with AAMBG RE.  Upon information and belief, Mr. Proffitt's loan was included in the ABN reinsurance program based on the date of origination and type of loan.

160.    As alleged above, Plaintiff Jackson's loan transaction took place on or around June 6, 2006.  Ms. Jackson was only put on notice of the *possibility* of her claims when she received a Notice on or around March 19, 2012.

161.    Ms. Jackson first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around April 24, 2012.

162.    Ms. Jackson signed a written agreement regarding KTMC's legal representation on or around April 27, 2012.

163.    Prior to communicating with counsel, nothing that Ms. Jackson received from Defendants following her closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of her respective mortgage and/or private mortgage insurance; or (iii) correspondence from her lender and/or Private Mortgage Insurer, provided her with notice of even the *possibility* of her claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon her costs or loan terms, or on her mortgage insurance or settlement rights or obligations.

164.    Once Plaintiff Jackson discovered the underlying basis for the claims alleged herein, she called Citi on May 9, 2012 to ask if her loan was part of the CitiMortgage reinsurance

program.  The representative did not answer.  She called again and spoke to a supervisor named Rachael, ID #37596, who could not answer her question.  Ms. Jackson only learned that her loan was part of the CitiMortgage reinsurance program with Citibank Mortgage RE with the assistance of counsel who obtained confirmation from counsel for PMI Mortgage Insurance Company.

165.    As alleged above, Plaintiff Lombre's loan transaction took place on or around June 6, 2006.  Ms. Lombre was only put on notice of the *possibility* of her claims when she received a Notice on or around September 14, 2011.

166.    Ms. Lombre first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around January 12, 2012.

167.    Ms. Lombre signed a written agreement regarding KTMC's legal representation on or around February 1, 2012.

168.    Prior to communicating with counsel, nothing that Ms. Lombre received from Defendants following her closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of her respective mortgage and/or private mortgage insurance; or (iii) correspondence from her lender and/or Private Mortgage Insurer, provided her with notice of even the *possibility* of her claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon her costs or loan terms, or on her mortgage insurance or settlement rights or obligations.

169.    Once Plaintiff Lombre discovered the underlying basis for the claims alleged herein, she made several calls to both her lender, CitiMortgage and Genworth, her mortgage

insurance provider, to inquire about whether her loan was part of the captive reinsurance arrangement. Ms. Lombre was ultimately unable to determine if her loan was included in the CitiMortgage reinsurance program. She first called Genworth on October 10, 2012 and spoke to a representative named Cathy. Cathy confirmed that Genworth was her mortgage insurance provider. When Ms. Lombre asked if her loan was reinsured, Cathy responded by asking if Ms. Lombre wanted to know if her loan was part of "HARP," which is not believed to concern reinsurance. Ms. Lombre only confirmed that her loan was reinsured with the CitiMortgage captive, Citibank Mortgage RE with the assistance of counsel on or around October 11, 2012, when Genworth's counsel, in response to Plaintiffs' counsel's inquiry, confirmed that her loan was reinsured. Counsel for CitiMortgage, on the other hand, has failed to respond to Plaintiffs' counsel's repeated requests for confirmation that Ms. Lombre's mortgage insurance was included in the Citi reinsurance program with Citibank Mortgage RE. *See* email chain from Edward W. Ciolko, Esq. to Patrick Sorek, Esq. (September 13, 2012, 5:30 p.m. EST; December 4, 2012, 12:53 p.m. EST), attached as Exhibit 50.

170.    As alleged above, Plaintiff Mullin's loan transaction took place on or around May 26, 2005. Mr. Mullin was only put on notice of the *possibility* of his claims when he received a Notice on or around March 19, 2012.

171.    Mr. Mullin first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around April 9, 2012.

172.    Mr. Mullin signed a written agreement regarding KTMC's legal representation on or around April 20, 2012.

173.    Prior to communicating with counsel, nothing that Mr. Mullin received from Defendants following his closing, by mail or otherwise, including, but not limited to: (i) any

notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or private mortgage insurance; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

174.    Once Plaintiff Mullin discovered the underlying basis for the claims alleged herein, he called Citi in or around April 20, 2012 to inquire about whether his loan was part of the captive reinsurance arrangement.  He was not able to independently confirm that the mortgage insurance on his loan was reinsured.  The customer service representative he spoke to was not "familiar" with the term reinsurance.  Mr. Mullin was only able to confirm that his mortgage insurance was reinsured with the assistance of counsel in September 2012.  Following a request for confirmation from Plaintiffs' counsel, counsel for PMI confirmed that Mr. Mullin's loan was included in the Citi captive.  Counsel for CitiMortgage, on the other hand, has failed to respond to Plaintiffs' counsel's repeated requests for confirmation that Mr. Mullin's mortgage insurance was included in the CitiMortgage reinsurance program with Citibank Mortgage RE. *See* Exhibit 50.

175.    As alleged above, Plaintiff Cranganu's loan transaction took place on or around July 24, 2008.  Mr. Cranganu was only put on notice of the *possibility* of his claims when he received a Notice on or around August 16, 2011.

176.    Mr. Cranganu first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around September 21, 2011.

177.    Mr. Cranganu signed a written agreement regarding KTMC's legal representation on or around March 9, 2012.

178.    Prior to communicating with counsel, nothing that Mr. Cranganu received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or private mortgage insurance; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims.   For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

179.    Once Plaintiff Cranganu discovered the underlying basis for the claims alleged herein, he called Citi on or about March 5, 2012 to inquire about whether his loan was part of the captive reinsurance arrangement.  The representative he spoke with told him that his mortgage insurance was provided by Citi's "PMI provider" but could not name the company.  Counsel for CitiMortgage has failed to respond to Plaintiffs' counsel's repeated requests for confirmation that Mr. Cranganu's mortgage insurance was included in the CitiMortgage reinsurance program with Citibank Mortgage RE.  *See* Exhibit 50.  Upon information and belief, Mr. Cranganu's loan was included in the ABN reinsurance program based on the date of origination and type of loan.

180.    As alleged above, the Rulisons' loan transaction took place on or around February 20, 2007.  The Rulisons were only put on notice of the *possibility* of their claims after reviewing a notice of investigation from counsel in or around February 2012.

181.    Prior to communicating with counsel, nothing that the Rulisons received from

Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon their costs or loan terms, or on their mortgage insurance or settlement rights or obligations.

182.    The Rulisons signed a written agreement regarding legal representation on or around March 9, 2012.

183.    Upon discovering the basis for bringing the claims alleged herein, they acted reasonably and pursued their claims in a timely manner by filing a lawsuit on April 19, 2012 in the United States District Court for the Southern District of New York, styled *Rulison v. ABN AMRO MORTGAGE GROUP, INC*, and docked as Case No. 12-cv-3094.  The Rulisons subsequently filed a Notice of Voluntary Dismissal, dismissing that action without prejudice to enable litigation of the claims here in this Court.

184.    The Rulisons then each signed a written agreement regarding Berger & Montague, P.C's and KTMC's legal representation on or around November 13, 2012.

185.    If Defendants cannot, or will not, provide basic and accurate information regarding the reinsurance of the mortgage insurance on Plaintiffs' loans, Plaintiffs surely cannot reasonably be taxed with any failure to obtain this information.  In fact, even attorneys for certain of the Private Mortgage Insurers have refused to respond to Plaintiffs' counsel's emails inquiring as to whether the mortgage insurance on Plaintiffs' loans was reinsured.

186.     Notably, even after discovering the possibility of their claims, and after multiple phone calls to Defendants' representatives and agents, Plaintiffs were unable to uncover basic facts underlying their claims—*i.e.,* whether the mortgage insurance on their loans was reinsured and, in some cases, the identity of their mortgage insurance provider.  As described above, even, Defendants' agents and representatives could not confirm if Plaintiffs' mortgage insurance was reinsured with Citibank Mortgage RE or AAMBG RE.  In fact, Plaintiffs were met with general ignorance from the Defendants' representatives with regard to reinsurance in general and, specifically, whether their loans were reinsured with Citi's or ABN's captives.

187.     Upon, information and belief, Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators.  As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off on the structures.  To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.
>
> Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

188.     Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of Defendants' captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert. Clearly, a mortgage provision stating that Defendants **may** enter into captive reinsurance relationships, coupled with assurances that any such arrangement will have no practical effect on a borrower's rights or interests, is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his

rights under RESPA may be violated.

189.    Similarly, a notice that states that Defendants may receive a financial benefit also does not put the average homebuyer on notice of any improper or illegal conduct.  *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").  This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

190.    Plaintiffs and other members of the putative Classes had no basis upon which to investigate the validity of the payments from the Private Mortgage Insurers to AAMBG RE and Citibank Mortgage RE for purported reinsurance.  Plaintiffs' and other members of the putative Classes' delay was excusable because they did not discover, and reasonably could not have discovered, Defendants' conduct as alleged herein, absent the specialized knowledge and/or assistance of counsel.  Once Plaintiffs did discover the basis for their claims, they acted reasonably and pursued their claims in a timely manner.

## CLASS ACTION ALLEGATIONS

191.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of two distinct classes:  (1) a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Citibank and/or CitiMortgage or any of its subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Citi's captive mortgage reinsurance arrangements (the "Citi Class"); and (2) a class of all other similarly

situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by ABN or any of its subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within ABN's captive mortgage reinsurance arrangements (the "ABN Class").

192.   The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

193.   The members of the Classes are so numerous that joinder of all members is impracticable.

194.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

195.   Plaintiffs' claims are typical of the claims of the members of the Classes.

196.   There are questions of law and fact common to the members of the Classes, the answers to which will advance the resolution of the claims of all the members of the Classes, including but not limited to:

a)      Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

b)      Whether payments to Citibank Mortgage RE and/or AAMBG RE were *bona fide* compensation and solely for services actually performed;

c)      Whether payments to Citibank Mortgage RE and/or AAMBG RE exceeded the value of any services actually performed;

d)      Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

e)   Whether Citi and ABN accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

f)   Whether the Private Mortgage Insurers paid or gave referral fees to Citi and ABN or a portion, split or percentage of borrowers' private mortgage insurance premiums to Citi and ABN other than for services actually performed;

g)   Whether the Private Mortgage Insurers entered an agreement/understanding to funnel kickbacks to Citi and ABM in exchange for the referral of business; and

h)   Whether Defendants are liable to Plaintiffs and the Classes for statutory damages pursuant to RESPA § 2607(d)(2).

197.   These questions of law and/or fact are common to the Citi Class and the ABN Class and predominate over any questions that may affect only individual members of the Classes.   The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan.   Rather, the captive reinsurance arrangements apply to groups or pools of loans.   Further, each and every member of the Classes that Plaintiffs seek to represent was required, as part and parcel of obtaining their Citibank, CitiMortgage and/or ABN mortgage loan, to pay for private mortgage insurance from one of the Defendant Private Mortgage Insurers—each of which had reinsurance contracts with Citibank Mortgage RE and AAMBG RE, structured as challenged here—to purchase "reinsurance" on that private mortgage insurance.   The essential and basic terms of each of those "reinsurance" contracts between Citibank Mortgage RE and AAMBG RE and the Defendant Private Mortgage Insurers were substantially similar, and each member of the Classes, no matter

the Private Mortgage Insurer to which they were referred, suffered the same harm entitling them to demand the same statutory damages. Accordingly, this is the quintessential consumer class action lawsuit.

198.  The same common issues predominate with respect to all members of the Classes, regardless of whether their loans were originated or funded by Citi and ABN or originated through correspondent lending. Regardless of whether Citi and ABN or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA.

199.  Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiffs have no claims antagonistic to those of the members of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the members of the Classes.

200.  Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

201.  Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

202.  Class action status is also warranted under Rule 23(b)(3) because questions of law

or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<div align="center">CLAIMS FOR RELIEF</div>

<div align="center">**COUNT ONE**
**(Violation of RESPA, 12 U.S.C. § 2607)**
**(By Plaintiffs Individually and on Behalf of the Classes)**</div>

203.    Plaintiffs hereby incorporate by reference the preceding ¶¶1-115 as if they were fully set forth herein.

204.    Throughout the Class Period, Defendants provided "settlement services" and/or engaged in business incident to real estate settlement services in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

205.    Plaintiffs and other members of the Classes obtained federally-related residential mortgage loans through Citibank, CitiMortgage and ABN and collectively have made hundreds of millions of dollars in private mortgage insurance premium payments in connection with their real estate closings.

206.    The amounts paid by the Defendant Private Mortgage Insurers and accepted by Citi and ABN through their captive reinsurance arrangements constitute "things of value" within the meaning of RESPA § 2602(2).

207.    Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Citibank Mortgage RE and AAMBG RE under carefully crafted excess-of-loss and purported quota share reinsurance contracts.

208.    These ceded premiums: (i) were not for services actually furnished or performed; and/or (ii) exceeded the value of any such services provided.

209.    The millions of dollars paid by the Defendant Private Mortgage Insurers and

accepted by Citi and ABN through their captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between Citi and ABN and the Defendant Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12 U.S.C. § 2607(a).

210. In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave, and Citi and ABN accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. § 2607(b). The money paid by the Defendant Private Mortgage Insurers and accepted by Citi and ABN through their captive reinsurers was a portion, split or percentage of the private mortgage insurance premiums paid by Citi's and ABN's customers. Citibank Mortgage RE and AAMBG RE participated in the scheme and served as the direct party to which the split was paid. Citibank Mortgage RE and AAMBG RE agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and other members of the Classes.

211. Plaintiffs and other members of the Classes were subjected to settlement services and/or business incident to real estate settlement services tainted by kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme, which involved each and every major provider of private mortgage insurance in the country. Defendants' reinsurance arrangements with the Defendant Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

212. First, Plaintiffs and other members of the Classes were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress bestowed upon Plaintiffs and other members of the Classes a right to a real estate settlement free from unlawful kickbacks and unearned fees, and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge.  *See* 12 U.S.C. §§ 2601, 2607(d)(2).  Defendant Private Mortgage Insurers have given, and Citi and ABN have accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or charges for business incident to real estate settlement services—private mortgage insurance premiums—in violation of RESPA.

213. Defendants' scheme also resulted in a limitation on both settlement service choice and competition.  Citi and ABN eliminated competition among providers of private mortgage insurance by requiring their borrowers to purchase private mortgage insurance from one of the Defendant Private Mortgage Insurers with whom they had an arrangement.  Upon information and belief, referred borrowers were allocated to one of the private mortgage insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in return for a referral fee.  The referral fee included no evaluation of price, quality, service provided, reputation, performance or any other aspect of the product provided by any of the private mortgage insurers receiving the referrals.

214. Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.  Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.  *See Carter v. Welles-*

*Bowen Realty, Inc.*, 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

215.    Moreover, though not necessary to prevail on their claims, Plaintiffs and other members of the Classes were harmed because their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.[15]   Congress has already determined that the ***aggregate*** effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").  Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.

216.    Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the members of the Classes necessarily and wrongly included payments for both: (i) actual mortgage insurance services; and (ii) payments unlawfully kicked back to Citi and ABN's captive reinsurers that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

217.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.  *See generally* Mortgage Kickbacks Scheme; Reinsurance

---

[15]    The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge." *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

Kickbacks.

218.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. §§ 2607(a) and (b).  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the members of the Classes in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

219.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiff also seeks attorneys' fees and costs of suit.

<div align="center">

**COUNT TWO**
**COMMON-LAW RESTITUTION/UNJUST ENRICHMENT**
**(By Plaintiffs Individually and on Behalf of the Classes Against the Citi and ABN )**

</div>

220.    Plaintiffs hereby incorporate by reference ¶¶1-115 and ¶¶203-20 as if they were fully set forth herein.

221.    Plaintiffs have conferred a substantial benefit upon the Citi and ABN Defendants which has been appreciated by Defendants.  During the Class Period, the Defendant Private Mortgage Insurers collected and wrongfully paid as a referral fee to Citi and ABN hundreds of millions of dollars as Citi's and ABN's unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and other members of the putative Classes.

222.    The amounts collected and ceded to Citibank Mortgage RE and AAMBG RE as purported reinsurance premiums were accepted and retained by Citi and ABN under circumstances such that it would be inequitable for Citi and ABN to retain the benefit of such payments given that the real insurance and/or transfer of risk contemplated by the agreement was not being provided.

223.    As a result of Defendants' unjust enrichment, Plaintiffs and the members of the Classes have sustained damages in an amount to be determined at trial and seek full

disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

224.    Further, Plaintiffs and the members of the Classes seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and members of the Classes and award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.    Awarding Plaintiffs and the members of the Classes statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.    Granting Plaintiffs and the members of the Classes costs of suit, including reasonable attorneys' fees and expenses;

E.    Granting Plaintiffs and the members of the Classes restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Classes; and

F.    Granting Plaintiffs and the Classes such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  August 16, 2013

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

By: */s/ Edward W. Ciolko*
Edward W. Ciolko
Terence S. Ziegler
Donna Siegel Moffa
Amanda R. Trask
Meredith Lambert
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**STEPHEN J. O'BRIEN & ASSOC.**
Stephen J. O'Brien
650 Ridge Road, Suite 400
Pittsburgh, PA 15205
Telephone: (412) 788-7560
Facsimile: (412 788-7563

**BERGER & MONTAGUE, P.C.**
Douglas M. Risen
Jacob M. Polakoff
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-4601
Facsimile:  (215) 875-5715

**BRAMSON PLUTZIK MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Counsel for Plaintiffs and the Proposed Class*

72

## <u>CERTIFICATE OF SERVICE</u>

And now, on this 16th day of August, 2013, I hereby certify that, pursuant to Local Rule

5.5 of the United States District Court for the Western District of Pennsylvania, the foregoing

document has been served by electronic means through the Court's transmission facilities on all

counsel of record.


<u>*/s/ Edward W. Ciolko*</u>
Edward W. Ciolko